[S. F. No. 22236.   In Bank.   Sept. 13, 1968.]

LOID D. BELLUS et al., Plaintiffs and Respondents, v. CITY OF EUREKA, Defendant and Appellant.

Melvin S. Johnsen, City Attorney, for Defendant and Appellant.

Hill & Neville and Robert W. Hill for Plaintiffs and Respondents.

TOBRINER, J.—Plaintiffs, members of the Police and Fire Departments of the City of Eureka suing on behalf of themselves individually and as representatives of the other mem-

bers of the two departments, sought a declaratory judgment that the pension payments directed to be made by Ordinance No. 2262, as amended, constitute a general obligation of the defendant, City of Eureka. The trial court found for plaintiffs. The City of Eureka appeals, contending that the pension payments are to be made solely from funds assigned to the retirement fund.

The complaint alleged "That an actual controversy has arisen between the parties in relation to the interpretation of said ordinance in that the parties are in dispute as to whether, under said ordinance and amendments thereto, the said ordinance creates a general tax liability of the City of Eureka from which benefits to plaintiffs and those similarly situated are to be paid, or whether said fund created by said ordinance is to be financed solely by contributions from the members of each Department [and matching contributions by the City as] mentioned therein."

Plaintiffs contend that any deficit in the retirement fund must be met by the City. The City argues that under express limitations of the State Pension Act (now Gov. Code, §§ 45300-45317) and of the city ordinance itself, it can be required to do no more than match the contributions of the members of the pension plan. In support of its contention, the City points to the parties' stipulation that the ordinance was adopted "under and in pursuance of the authority of Chapter 321 of the Statutes of 1937, as amended by Chapter 1080 of Statutes of 1941 [hereinafter the 'State Pension Act'], to which statutes reference is made in Section 17 of said ordinance; . . ." As we explain below, the ordinance, which is set out in the margin,[1] may have adopted only the procedural provisions of

[1] Ordinance No. 2262 provides, in relevant part, as follows:

Section 3 provides conditions for the retirement of members of the police and fire departments, and then states that after retirement a member "shall be paid from such Fund a yearly pension, in semi-monthly installments, equal to one-half the amount of the salary attached to the rank which he may have held in such Fire Department or Police Department for a period of One (1) Year next preceding the date of his retirement. That said one-half payable is the basic rate and shall be determined by the Commission [see sections 1-2 of the ordinance] in accordance with the amount of money in the Fund, as hereinafter provided."

Section 4 provides for payment of a pension to certain survivors "in the event of the death of any member of the Fire or Police Department, who shall, at the time of his death, be receiving a pension, or be eligible to receive a pension, as provided in Section 3 of this Ordinance, then, and in that event, and in the same manner the pension which such Fireman or Policeman was either receiving, or entitled to receive, . . ."

Sections 5, 6, and 8 govern retirement payments upon a showing of disability.

Section 7 provides: "Whenever any member of the Fire or Police

340

the State Pension Act, and, secondly, even if the ordinance incorporates the substantive as well as the procedural provisions of the state act, the substantive provisions as incorporated into the pension ordinance must be construed in light of the well-established rule of liberal construction of pension plans to protect the reasonable expectations of the employees.

Department shall die from causes other than as a direct or indirect result of the actual performance of his duty as a Fireman or Policeman, then his widow or children, or if there be no widow or children, then his mother or father, or other heirs, shall be entitled to receive the total contributions made by such member, plus a reasonable rate of interest, to be set by the Commission, less one-half that amount received as a pension before death. That in the event any Fireman or Policeman shall die without heirs, the amount collectible by him hereunder shall remain in the Fund.''

Section 10 provides: ''The Retirement Fund shall be established and maintained in the following manner:—That there shall be deducted from the regular monthly salary of each member of the Fire and Police Department Five (5) Per Cent thereof, as a basic rate, to be placed in said Fund. That the Council of the City of Eureka shall place in said Fund from any suitable funds available a sum not less than the amount contributed each month by each member of said Fire or Police Department. . . . That any contributions made, either by gift, devise or from any other source, for the purpose of adding to such Firemen's and Policemen's Retirement Fund, shall be received and placed therein without any deductions from the salaries of the members of either Department or contribution by the City of Eureka to match the same. That said Fund shall not be used for any other purpose than as herein provided and cannot be transferred to any other Fund.''

Section 11 provides: ''That in the event there shall not be sufficient moneys in the Fund to pay the amounts in this Ordinance provided by the donations, contributions, the deductions from the salaries of the members of the Departments and the contributions by the City of Eureka, then the amount of deductions from the salaries of the members to be placed in said Fund may be increased by a majority vote of the members of the Fire Department, Police Department and Council of the City of Eureka, to be matched by a similar increase by the City of Eureka. Each Department shall hold a secret vote separate from the other, and the City Council shall vote separate from either Department. The increase to be effective must have a majority vote in each Department and in the Council. If no increase is voted and there shall not be sufficient moneys in the Fund to make the payments herein provided, then such payments shall be reduced pro rata to an amount payments can be made from the Fund. That said pro rata reduction in the pensions or payments herein provided can only be made by a majority vote of the members of each Department and the City Council and only in an amount agreed upon by said three Departments. Each shall hold separate vote[s].''

Section 12 provides that if a member is permanently separated from the service and not entitled to retirement benefits under the ordinance, ''then all moneys theretofore paid into such Fund, by such member, shall be returned to such member, if alive; otherwise, to his widow, if any, and if there be no widow, then to his child or children, if any, and if there be no widow or children, then to his parents, and if there be no parents, then to his heirs at law. . . .''

Section 14 provides that the Retirement Commission may direct the City Treasurer to deposit surplus funds in a bank to draw interest for the benefit of the retirement fund, and further declares that ''it shall be

Applying this rule to the State Pension Act as incorporated into the ordinance, we conclude that the absence of any express limitation of the City's liability to the amount in the fund renders it liable for the full amount of benefits provided by the pension plan.

1. *Adoption of the Ordinance Pursuant to the State Pension Act.*

Three resolutions of the city council and an ordinance adopted by that council providing for submitting the pension ordinance to the electorate mention the State Pension Act. Resolution No. 3339, adopted May 4, 1943, states in its title, "Establishing a Retirement Fund in Accordance with Chapter 321 of the Statutes of 1937 as amended by Chapter 1080 of the Statutes of 1941." The only other reference to the state act in the resolution is as follows: "Whereas, under and by virtue of Chapter 1080 of the Statutes of 1941, before said proposed Ordinance can be presented for passage, a vote by secret ballot must be taken by the members of each Department separate from the other for their approval or disapproval of such retirement proposal."

Resolution No. 3341, adopted on May 10, 1943, declaring that an ordinance should be drafted to be placed on the ballot at the general municipal election to be held June 21, 1943, contains only the following reference (in addition to that made in the title) to the state act: "Whereas, in accordance with the Statute in such case made and provided, the proposed Ordinance was submitted to the Eureka Paid Fire Department for a vote thereon and to the Eureka Paid Police

---

the duty of the Commission to find and establish what are surplus funds and what amount is necessary to be kept in the Fund for current expenditures."

Section 16 governs amendment of the ordinance.

Section 17 provides that other municipal employees may be included in the retirement system "only by a majority vote of such other Municipal Departments or employees of other Municipalities by *a vote held in accordance with Chapter 321 of the Statutes of 1937, as amended by Chapter 1080 of the Statutes of 1941, and as may be amended by other Acts of the Legislature in effect at the time such proposal is made,* and by a secret ballot of the members of the Fire and Police Department by a majority vote thereof, and a majority vote by the Council of the City of Eureka. . . ." (Italics added.)

Section 19 provides: "It is the intent and purpose that *each person entitled to the benefits of this Ordinance has a property interest* therein *for purposes of withdrawal,* as provided, *and an estate to his dependents and heirs* in a sum equivalent to the amount he shall have contributed, plus a reasonable rate of interest, less any deductions provided, *and for disability and retirement payments to the full extent of the provisions herein.*" (Italics added.)

Department for their vote thereon, by Resolution No. 3339,
. . .''

Ordinance No. 2256, adopted on May 18, 1943, provides for a general municipal election submitting to the electorate an ordinance establishing a contributory retirement system for members of the police and fire departments. The only reference to the state act in this ordinance is as follows: ''That the General Laws of the State of California, Chapter 321 of the Statutes of 1937, as amended by Chapter 1080 of the Statutes of 1941, provides that Ordinances may be passed by Incorporated Cities, either by the Council by a two-thirds majority vote or by a majority vote of the Electorate of the City, for the establishment of a Retirement and Pension System . . . . That in accordance with such General Laws, an Ordinance was proposed to carry into effect the provisions thereof for the Eureka Paid Fire Department and Eureka Paid Police Department. That after said Ordinance had been proposed, Resolution No. 3339 was duly passed . . . the proposed Ordinance . . . establishing a Retirement Fund for the members of the Eureka Paid Fire Department and the members of the Eureka Paid Police Department in accordance with Chapter 321 of the Statutes of 1937, as amended by Chapter 1080 of the Statutes of 1941.'' (§ 3.)

Finally, Resolution No. 3348, which declares the pension ordinance to be the law of Eureka, does not mention the State Pension Act.[2]

The ordinance ''Establishing a Contributory Retirement System for Members of the Fire Department and Police Department of the City of Eureka'' does not mention the State Pension Act in its title or in any of its substantive provisions, many of which differ from the state act.[3] The ordinance men-

---

[2]The resolution declares: ''That it is hereby found that said proposed ordinance appearing on the ballot in the following manner 'Shall the proposed Ordinance to establish a contributory retirement system for the members of the Eureka Paid Fire Department and the Eureka Paid Police Department, creating a Commission to be known as ''The Firemen's and Policemen's Retirement Fund Commission'' providing necessary funds to establish and maintain said Retirement System; providing for the payment to Firemen and Policemen from the Funds; establishing rules and regulations for the collection and disbursement of said funds; providing the means for amendment of the ordinance and providing for the method of participation by other Municipal employees of the City of Eureka and other Municipalities in funds and contributions to be made in such case, become a law of the City of Eureka?' received a majority of affirmative vote . . . and the same is hereby declared to be the law of the City of Eureka . . . .''

[3]Section 1 of the State Pension Act (as amended in 1941) provides: ''Any city within this State is hereby authorized to adopt by ordinance

tions the state act only in section 17, which governs the extension of the pension plan to other municipal employees. (See fn. 1, *supra*.)

The only section of the ordinance mentioning the state act

a retirement or pension system for its officers and employees and provide for the payment of retirement allowances, pensions, disability payments and death benefits, or any of them. Said ordinance shall provide for the appointment of a retirement board and for the delegation to such board of such powers and duties in relation to such system as be deemed advisable to carry out the intent and purpose of this act. The ordinance adopting a retirement or pension system may be adopted either by a majority vote of the electorate of the city or by approval of a two-thirds majority of the governing body of such city. In either case of adoption said ordinance can not be repealed except by a vote of the electorate.

"*It is intended by the provisions of this act to enable any city within this State to adopt such a retirement system as may be adaptable to the size and type of city involved.*" (Italics added.) (Stats. 1941, ch. 1080, p. 2778; see Gov. Code, §§ 45300, 45301, 45306.)

Section 2 provides that the city council shall adopt a resolution which gives notice of intention to adopt a pension ordinance and summarizes the provisions of the proposed ordinance. It further requires a vote by secret ballot and majority approval by any group of employees proposed to be covered. (Stats. 1941, ch. 1080, p. 2778; see Gov. Code, §§ 45302-45305.)

Section 3 provides that the ordinance establishing the pension or retirement system "shall, among other things, provide for the following:

"(a) The amount of benefits to be paid to any officers or employees, or their beneficiaries, and the terms and conditions upon which such benefits shall be paid.

"(b) The contribution to be paid by such officer or employee to the pension and retirement fund.

"(c) The contribution to be paid by the city to the pension and retirement fund, which, exclusive of contributions paid on account of service rendered prior to the effective date of the ordinance, shall not exceed the total contribution paid to the pension and retirement fund by the officers and employees.

"(d) The personnel of the retirement board, which shall consist of not less than five members, at least two members of which shall be elected by the officers and employees who have been included in such retirement system.

"(e) The adoption of rules and regulations for the administration of such a retirement or pension system by the retirement board.

"(f) The refunding to any officer or employee who withdraws from the retirement system, prior to retirement, of the amount of such officer's or employee's contribution, with such interest as may have been credited to his contribution." (Stats. 1941, ch. 1080, p. 2779; see Gov. Code, § 45309.)

Section 4 provides that the amount of the pension may be predicated on the services rendered to the city by the employee prior to adoption of the plan and further provides that employee contributions to the fund may be made by deductions from salary. (Stats. 1937, ch. 321, p. 701; see Gov. Code, § 45310.)

Section 5 declares that nothing in the act prohibits enhancement of the fund by private or voluntary contributions or transfers to the fund by the city of surplus municipal funds. (Stats. 1937, ch. 321, p. 701; see Gov. Code, § 45312.)

Section 6 provides that the city may levy annually a special tax "to provide sufficient revenue to meet the obligation of the city to the said

thus merely adopts the procedure established by the act for the inclusion of municipal employees into a contributory pension and retirement plan. (See § 2 of the State Pension Act, *supra*, fn. 3.) Resolution No. 3339, declaring the proposed pension ordinance, follows the notice requirement of section 2 of the act. (See fn. 3, *supra*.) And Resolution No. 3341, which declares that a pension ordinance should be drafted and placed on the ballot, and Ordinance No. 2256, which provides for the election, follow the requirement in section 1 of the act that the pension system be adopted by a majority vote of the electorate. (See fn. 3, *supra*.)

The substantive provisions of the pension ordinance, on the other hand, vary from those of the state act. Section 7 of the ordinance gives to the surviving widow, children, or other heirs of a member of the fire or police department who died from a cause unconnected with his employment, a right to part of the contributions of the decedent plus interest. The State Pension Act contains no corresponding provision.

Section 10 of the ordinance requires the City to contribute a sum "not less than" that contributed by the employees, while section 3, subdivision (c), of the state act provides that the City's mandatory contribution to the fund "shall not exceed" that contributed by the employees. And more importantly, section 11 of the ordinance, which has no corresponding provision in the state act, provides that in case of insufficient pension funds, employee contributions can be increased and/or pension payments pro rata decreased only by majority vote of the employees. The state act, on the other hand, is completely silent on the effects of insufficient pension funds.

Finally, section 19 of the ordinance, which has no corresponding section in the state act, vests a "property interest" in each person entitled to the benefits of the ordinance, "for

pension and retirement fund as defined and limited by subdivision (c) of section 3 hereof; which said rate of taxation may be in addition to the annual rate of taxation allowed by law to be levied in said city." (Stats. 1937, ch. 321, p. 701; see Gov. Code, § 45311.)

Section 7 requires the retirement board to require competent medical proof before retiring an employee for disability, and further provides for reduced pension payments upon proof of diminished disability. (Stats. 1937, ch. 321, p. 701; see Gov. Code, §§ 45313-45315.)

Section 8 provides: "This act shall not be deemed to repeal any existing acts under which pension or retirement systems may have been heretofore adopted, but is intended to be and is an enabling act providing an alternative procedure for the establishment of pension and retirement systems. Any regularly established fire or police protection district is hereby authorized to adopt a pension or retirement system for its employees under the provisions of this enabling act." (Stats. 1937, ch. 321, pp. 701-702; see Gov. Code, §§ 45316, 45317.)

the purposes of withdrawal, . . . an estate to *his dependents and heirs in a sum equivalent to the amount he shall have contributed*, . . . and *for disability and retirement payments to the full extent of the provisions herein.*'' (Italics added.)

Reading section 3 of the ordinance, which provides that those entitled to retirement pensions ''shall'' receive a pension equal to one-half of the salary attached to the rank held for one year preceding retirement, together with sections 10, 11, and 19, one can conclude only that a person entitled to retirement or disability benefits under the ordinance, as well as any beneficiary of the employee, is entitled to the amount specified in the ordinance regardless of the amount in the fund. Therefore, either the city owes a continuing obligation to contribute to the fund those amounts adequate to fulfill current and future claims under the ordinance, or the city bears a general liability under the ordinance unlimited by its statutory obligation to make contributions to the pension fund. Of course, either alternative equally protects the member of the pension plan (and his potential beneficiaries), and both are in line with ''the well-recognized rule that all pension laws are liberally construed to carry out their beneficient policy.'' (*England* v. *City of Long Beach* (1945) 27 Cal.2d 343, 346-347 [163 P.2d 865]; *Wendland* v. *City of Alameda* (1956) 46 Cal.2d 786, 791 [298 P. 863]; *Dillard* v. *City of Los Angeles* (1942) 20 Cal.2d 599, 602 [127 P.2d 917]; *Klench* v. *Board of Pension Fund Comrs.* (1926) 79 Cal.App. 171, 187 [249 P. 46].)

▮ Charter cities which possess complete power over municipal affairs may adopt part of a general law in an ordinance governing a municipal affair without thereby being bound by all the provisions of that general law. (*City of Redondo Beach* v. *Taxpayers, Property Owners, etc. City of Redondo Beach* (1960) 54 Cal.2d 126, 137 [5 Cal.Rptr. 10, 352 P.2d 170]; *City of Santa Monica* v. *Grubb* (1966) 245 Cal. App.2d 718, 723-726 [54 Cal.Rptr. 210]; cf. *Mullins* v. *Henderson* (1946) 75 Cal.App.2d 117, 130 [170 P.2d 118] : ''none of [the cases involving charters expressly incorporating general laws] hold that a reference to a general law for one express purpose also incorporates the law in any other respect.'') The City here agrees that establishment of an employee pension plan is a municipal affair.

''In 1917, the city of Eureka availed itself of the privilege given to it by the [1914] amendments of sections 6 and 8 of the [California] constitution, . . . and amended section 22 of

article III of its freeholders' charter to provide that thereafter the city should 'have the power to make and enforce any and all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter as the same now is or may be hereafter amended; . . . *and no enumeration or specific statement herein of any particular powers shall be held to be exclusive or a limitation of the foregoing general grant of powers.'* (Stats. 1917, p. 1743.) By this amendment to its charter the city brought itself within the conditions of the amendments of 1914 to sections 6 and 8 of article XI of the constitution. Thereupon, according to the terms of those sections, its powers over municipal affairs became all-embracing, restricted and limited by the charter only. The result is that the city has become *independent of control by general laws upon municipal affairs.* [Citation.]'' (Italics added.) (*Sunter* v. *Fraser* (1924) 194 Cal. 337, 343 [228 P. 660].)

Chartered cities have full power to regulate municipal affairs, and ordinances governing municipal affairs supersede general laws insofar as the latter conflict with the ordinance unless the state has preempted the field. (See *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809] ; 5 McQuillin, Municipal Corporations (3d ed. 1949) § 15.20, at p. 98; 6 McQuillin, *op.cit. supra,* § 21.33, at pp. 244-246.)

The State Pension Act by its own terms makes clear that its provisions are not intended to preempt the field of pensions for municipal employees. (See section 1, *supra,* fn. 3 ; cf. *Grace* v. *City of Los Angeles* (1967) 249 Cal.App.2d 577, 584 [58 Cal.Rptr. 388].)

The City contends, however, that because its charter contains no express provision relating to pension plans the City was required to incorporate all of the State Pension Act. The City's contention rests on *Blake* v. *City of Eureka* (1927) 201 Cal. 643 [258 P. 945], a decision which conflicts with the purpose of the 1914 amendment to the California Constitution and the general case law on the power of charter cities. We therefore now overrule *Blake.*

*Blake* held (201 Cal. at p. 657) that a section of the charter adopted in 1895 (Stats. 1895, p. 403), which provided that all matters not provided for in the charter shall be conducted pursuant to applicable general laws, governed over section 22 of the charter, adopted in 1917, which provided that the City shall have the power to make all laws governing municipal affairs regardless of the lack of any specific enumeration of

power in the charter. (See *Sunter* v. *Fraser, supra,* 194 Cal. 337, at p. 343.)[4] *Blake's* holding ignores the purpose of the section added to the charter in 1895, as well as the 1914 amendment of the California Constitution which removed the necessity for enumeration of powers in the charter with respect to municipal affairs. (See generally, Graybiel, *Review of Recent California Decisions on Municipal Law* (1923) 11 Cal.L.Rev. 73, 91.) The 1895 provision merely restated "the opinion then prevailing that a city charter must contain a specific grant of power with reference to its conduct of municipal affairs." (*West Coast Advertising Co.* v. *City & County of San Francisco* (1939) 14 Cal.2d 516, 519 [95 P.2d 138].) ■ The purpose of the 1914 constitutional amendment was to free cities which availed themselves of "home rule" of the control of general laws in the area of municipal affairs and to give them complete control over such matters whether or not their charter expressly enumerated a power over the municipal affair in question. (See *West Coast Advertising Co.* v. *City & County of San Francisco, supra,* 14 Cal.2d at p. 521; *City of Pasadena* v. *Charleville* (1932) 215 Cal. 384, 388-389 [10 P.2d 745].)

*City of San Jose* v. *Lynch* (1935) 4 Cal.2d 760 [52 P.2d 919], refused to adopt the reasoning underlying *Blake* and therefore in effect overruled *Blake.* In *Lynch,* the City of San Jose, which adopted a "home rule" provision in 1934, argued that an improvement procedure ordinance was invalid because it conflicted with the State Improvement Act of 1911. The City urged that a 1915 charter provision, which required that general laws in force at the time would govern improvement procedures, constituted a charter limitation upon the City's power over municipal affairs and remained effective after the adoption of "home rule" in 1934. We rejected this contention, stating that the 1934 amendment of the charter "is general in that it is intended as an amendment of the entire charter, rather than amending separately each section relating to matters of purely municipal character. It must therefore be construed as having the effect of causing [the 1915 provision] to provide for the governing of special assessment street

---

[4]The City incorrectly contends that the 1895 charter provision was amended in 1965 to remove the limitation with respect to municipal affairs. The section as amended in 1965 (Stats. 1965, p. 5307) does not mention municipal affairs. It provides: "The City shall have the power to and *may* act pursuant to any procedure established by any law of the State, *unless* a different procedure is required by this Chapter." (Italics added.)

improvements by general law [unless a different procedure was provided] at the time of the improvement in the charter *or by ordinance.*'' (Italics added.) (4 Cal.2d at pp. 765-766.)

The 1917 amendment of the Eureka Charter similarly was intended as an amendment of the entire charter. (See Stats. 1917, ch. 12, at pp. 1742-1743.) And a new provision vesting complete control over municipal affairs in the city (Stats. 1917, ch. 12, § 22, pp. 1743-1744) specifically declares that enumeration of the power in the charter is not necessary to remove a municipal affair from the control of general law. Section 22 must therefore be read as amending the 1895 provision to declare that general laws control with respect to municipal affairs unless the city by charter amendment *or passage of an ordinance* exercises its power acquired by adoption of "home rule" in 1914. (Cf. *City of San Jose* v. *Lynch, supra,* 4 Cal.2d 760, 765-766, overruling *Blake* v. *City of Eureka, supra,* 201 Cal. 643.) We are therefore not obligated to construe the pension ordinance in light of the State Pension Act, but rather must construe the state act in light of its incorporation (whether it be partial or whole) into an ordinance governing a municipal affair adopted by a city with "all-embracing" power over municipal affairs. (See *Sunter* v. *Fraser, supra,* 194 Cal. 337, 343.)

*2. Construction of the State Pension Act in Light of its Incorporation into an Ordinance Adopted by a Charter City on the Question of the City's Liability.*

Even assuming that the pension ordinance incorporates the substantive as well as the procedural provisions of the State Pension Act, the question whether the City's liability is limited by the pension fund under the act as incorporated into the ordinance must be determined pursuant to the well-established rule of liberal construction of municipal pension plans. Applying that rule here, we hold that the pension payments directed to be made by section 3 of the pension ordinance (see fn. 1, *supra*) constitute general obligations of the City and are not limited in amount by the sums assigned to the pension fund by section 10 of the ordinance or section 3 of the State Pension Act. (Cf. *England* v. *City of Long Beach, supra,* 27 Cal.2d 343, 346-347; *Eaton* v. *City of Los Angeles* (1962) 201 Cal.App.2d 326, 332-333 [20 Cal.Rptr. 456]; 3 McQuillin, *op.cit. supra,* § 12.145, at p. 614.)

As previously discussed, section 3 of the ordinance provides that a member of the fire or police department, upon becoming eligible for retirement, "shall be paid" a yearly pension.

Section 11 of the ordinance declares that the commission may not make pro rata reductions of pension payments unless a majority of each department by secret ballot votes approval of such reduction. Section 11, moreover, provides that the City may not increase the amount of salary deductions for the pension fund unless similar majority approval is received. Sections 3 and 11 together therefore mean that in the event the members do not vote for increased salary deductions or pro rata decreased pension payments, the City must provide the necessary sums to pay the pensions and other benefits provided for by the ordinance. Section 19 of the ordinance substantiates the propriety of this construction. Section 19 vests a "property interest" in each person entitled to the benefits of the plan "for purposes of withdrawal, . . . an estate to his dependents and heirs in a sum equivalent to the amount he shall have contributed, plus a reasonable rate of interest, less any deductions provided, and for disability and retirement payments to the full extent of the provisions herein." (See also sections 7 and 14, *supra*, fn. 1.)

The provision in section 3 of the ordinance that the pension payments "shall be paid from such Fund," and the specifications of the amount the City is required to pay into that fund in section 10 of the ordinance and section 3 of the State Pension Act (assuming its total incorporation into the ordinance) do not require a construction of the pension plan different from the above interpretation which imposes upon the City a general obligation to make the payments specified in section 3 of the ordinance.

In *England* v. *City of Long Beach, supra,* 27 Cal.2d at page 346, the charter "provided that the city manager 'shall include in his annual budget an amount equal to two per cent of the estimated pay of the members of the police and fire departments, . . . and the city council shall appropriate such amount to the ''Relief and Pension Fund.'' ' It also provided: 'There shall be paid into the said fund, . . . (b) The amount appropriated by the city council, . . .' '' The charter further ''provided that after twenty years' service a fireman, upon his application, *'shall be retired and paid* in equal monthly installments *from said fund* a limited pension' of fifty per cent of his annual salary, . . .'' (27 Cal.2d at p. 347.)

The provision that the member eligible for retirement "shall be retired and paid . . . from such fund" a certain pension and the provision that "the amount appropriated by

the city council" "shall be paid into the said fund" are strikingly similar, respectively, to section 3 of the pension ordinance, on the one hand, and section 3 of the State Pension Act and section 10 of the ordinance, on the other. Our construction of the appropriation and payment of pension provisions of the charter in *England* therefore applies equally to the analogous provisions of the pension ordinance and State Pension Act (as incorporated into the ordinance) in the instant case.

As we said in *England,* the language of these provisions, together with other provisions of the pension ordinance (e.g., § 19) "may reasonably be interpreted to mean that a retiring fireman [or policeman] is entitled to a pension of the amount designated; that it was intended to provide an outright, unqualified pension; and that the words 'from said fund,' together with the provisions of subdivision [(c) of section 3 of the State Pension Act and section 10 of the pension ordinance which assumedly incorporates it], were not intended as a qualification or limitation but that the pension fund was created, and payments ordered made therefrom, simply as an orderly and customary means of administering city moneys." (27 Cal.2d at p. 347.) Moreover, here, as in *England,* there is no language in either the State Pension Act or the pension ordinance "which expressly limit[s] pension payments to the money in the pension fund or the particular items mentioned as sources of income to the fund . . . ." (27 Cal.2d at p. 347.) And finally, as we did in *England,* we must reject any argument "that if a general obligation had been intended, the voters would have stated specifically that the city should levy a tax sufficient to cover all pension payments. It may be argued with equal force . . . that the voters could, but did not, specify that payments must be made from the pension fund alone." (27 Cal.2d at p. 347.)

The rationale underlying the rule of construction in *England*—that the City's liability for pension payments is not limited to the pension fund unless the pension plan clearly specifies that limitation—and the general rule that pension plans be liberally construed to promote their beneficent purpose (see e.g., *Dillard* v. *City of Los Angeles, supra,* 20 Cal.2d 599, at p. 602) rests on the same duty of fair dealing and obligation to protect the reasonable expectations of those whose reliance is induced that underlie the rules of construction in favor of the insured in insurance cases and in favor of the party of reduced bargaining power in cases involving

other standardized contracts. (See, e.g., *Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 269-271 [54 Cal.Rptr. 105, 419 P.2d 168], and cases and authorities cited therein.)

■ The pension provisions of a city charter or ordinance form an integral part of the employment contract. (*Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 852; *Dryden* v. *Board of Pension Comrs.* (1936) 6 Cal.2d 575, 579 [59 P.2d 104].) One purpose of providing pensions for municipal officers is to induce them to enter and continue in the service of the city. Another is to provide sufficient subsistence for retired or disabled officers (or their dependents) who have performed their obligations under the employment contract. (See *Klench* v. *Board of Pension Fund Comrs., supra,* 79 Cal.App. 171, 189.) Therefore, when the ordinance establishing the pension plan can reasonably be construed to guarantee full payment to those entitled to its benefits regardless of the amount in the fund established by the pension plan, then "we are, of course, required to construe the provisions liberally in favor of the applicant so as to carry out their beneficient policy." (*Wendland* v. *City of Alameda, supra,* 46 Cal.2d 786, 791; *Dillard* v. *City of Los Angeles, supra,* 20 Cal.2d 599, 602.)

As we explained in *England,* "We must . . . reject any theory that the provisions of the [ordinance] were designed to create an appearance of granting pensions while at the same time withholding the benefits by providing inadequate funds. (Cf. *Gibson* v. *City of San Diego* [(1945)] 25 Cal.2d 930, 935 [156 P.2d 737]. . . .) The insufficiency of the fund may have resulted simply from a mistaken belief that the fund would be adequate or from an intent that it should constitute but a partial source of pension payments with the balance to be made up out of the city's general revenues.

"The injustice that would prevail if the provisions relating to the fund were construed to be a limitation on the obligation to pay pensions is apparent. The existence of a pension plan is, of course, a strong factor inducing persons to enter into or remain in a particular employment. Moreover, the employee[s] involved here [were] required to contribute a portion of [their] salary to the pension fund. Although provision was made for substantial pensions, the inadequacy of the provisions for maintenance of the pension fund was not apparent from the face of the [state statute or ordinance]. As before noted, [neither the state act nor the ordinance] expressly limit[s] the obligation of the city to the payment of the pen-

sions from the pension fund. It obviously would be unjust to make the payment of pensions dependent upon the solvency of a particular fund, thereby depriving employees of the benefits of the system, *unless we [are] compelled to do so by a clear, positive command in the [act or ordinance].*'' (Italics added.) (27 Cal.2d at p. 348.)

We conclude that a charter city, possessed of plenary power to adopt a pension system imposing upon it a general obligation, cannot escape liability for those pension payments which it has led its employees reasonably to expect. In this respect it is no different than any other employer or public service institution which induces reliance upon a contract which may reasonably be interpreted to afford that protection which has been impliedly promised. We recognize that the City will not be so obligated if the pension plan which it adopts, either in the ordinance itself or the statutory scheme which it incorporates, clearly and explicitly limits its liability to the fund which the pension plan establishes. In the absence of such a limitation, and especially here, in light of the provisions that provide that an employee eligible for retirement or disability pay ''shall'' receive a certain amount, that vest the beneficiaries of the pension plan with a ''property interest'' in the fund for purposes of withdrawal and receipt of payments, and that declare that pension payments shall not be reduced without the majority approval of both departments, we must conclude that the City of Eureka bears a general obligation under the pension ordinance.

The judgment is affirmed.

Peters, J., Mosk, J., and Sullivan, J., concurred.

BURKE, J.—I dissent. At the outset it should be noted that no question is presented in this case of failure to pay a pension to any member of the fire or police departments of defendant City. Instead, the case stems from a report of professional actuaries that as of October 31, 1964, the retirement fund established by Ordinance 2262 (pension ordinance) had an unfunded liability of some $2,742,899, not covered by total assets of $445,677.51. The controversy concededly relates only to the interpretation to be placed on the pension ordinance in determining the sources from which the pensions therein provided are to be financed. I am convinced that any objective view of the law and the facts compels the conclusion that under the express limitations of the ordinance and of the

state statute (Pension Act) pursuant to which it was enacted, the City can be required to do no more than match the contributions of the employee members to the retirement fund. That this was also the intent and the understanding of the fire and police departments, who sponsored the pension ordinance and whose prior approval is (by the terms of the ordinance itself) required before the ordinance can be amended by the city council, is demonstrated by the approval given by the members of those departments to a 1959 amendment which *increased* their own required contributions to the retirement fund.

The ordinance, No. 2262, was enacted by vote of the people of defendant City in 1943. It contains relevant provisions not mentioned by the majority opinion and which will be more fully discussed, including the section (§ 16; see fn. 8, *post*) permitting amendment of the ordinance by the city council only after prior approval by the firemen and policemen. In 1948 and 1959 the ordinance was so amended.

As the majority opinion notes, the parties have *stipulated* that the people adopted the ordinance pursuant to the authority of a specified state law. (''Chapter 321 of the Statutes of 1937, as amended by Chapter 1080 of Statutes of 1941 [Pension Act[1]], to which statutes reference is made in section 17 of said ordinance. . . .'') To my mind, the three city council resolutions which preceded the adoption of the pension plan and an ordinance (No. 2256) adopted by the council giving effect to the plan, discussed by the majority, demonstrate unequivocally that the pension ordinance *was* adopted under and pursuant to the authority of the Pension Act, and support the stipulation of the parties to that effect.[2] Further, such

---

[1]Those statutes were codified in 1949 (Stats. 1949, ch. 79, p. 249) as article 1 (commencing with § 45300) of chapter 2 of division 5 of title 4 of the Government Code. However, in this opinion all references will be to the statutes and the sections thereof as they existed when Ordinance 2262 was adopted in 1943.

[2]Resolution No. 3339, adopted May 4, 1943, contains in its title and in the body of the resolution a declaration that the proposed ordinance is for the purpose of establishing a retirement fund for the city policemen and firemen in accordance with the 1937 Pension Act. The resolution then recites that under the Pension Act, before the proposed ordinance can be presented for passage, a vote by secret ballot must be taken by the members of each such department separate from the other for their approval or disapproval of such retirement proposal, and then proceeds to make provision for submitting the proposed ordinance to the firemen and policemen for their secret ballot.

Resolution No. 3341, adopted by the city council on May 10, 1943, declares the results of the elections held in the two departments pursuant to the 1937 Pension Act and of the vote of the council on the proposed

resolutions and Ordinance 2256 disclose that in adopting the pension ordinance the City followed *every procedural step* laid down *in the Pension Act;* the pension ordinance itself includes *every mandatory provision* required by the Pension Act; and none of the other provisions of the pension ordinance violates any requirement or specification of that act. The Pension Act obviously does not purport to set forth in toto every provision which an ordinance adopted under it shall contain, but the act *does* lay down certain requirements and limitations, with *each of which* the pension ordinance here in issue complied. Additionally, the record shows that the City's firemen and policemen actively participated in drafting the pension ordinance.[3] This fact, plus provisions of the Pension Act and of the ordinance, hereinafter pointed out, making the adoption, enlargement, and amendment of the fire and police retirement system of the City subject to the prior approval of the members of those departments, leaves no room in this case for the blind application of the general principle of liberal construction of pension laws, here espoused by the majority, to impose upon the City, which means upon its taxpayers, an unlimited and continuing obligation in contravention of the provisions of the Pension Act and of the pension ordinance, taken either singly or together.

As noted in *Klench* v. *Board of Pension Fund Comrs.* (1926) 79 Cal.App. 171, 187 [249 P. 46], cited by the majority, ''Of course, these rules of statutory construction, as applied to pension laws, are of no consequence where the

---

pension ordinance, and orders an ordinance to be drafted to place the proposal on the ballot at the general municipal election to be held on June 21, 1943.

Ordinance 2256, adopted on May 18, 1943, likewise relates that the pension ordinance was being proposed in accordance with the Pension Act and directs that the proposed pension ordinance be submitted to the electorate at the general election to be held June 21, 1943.

Resolution No. 3348, adopted June 29, 1943, declares in pertinent part that the proposed pension ordinance was voted upon at the June 21, 1943, general election and carried by a vote of 2991 to 830.

[3] The minutes of a city council meeting held March 16, 1943, relate that ''A letter from the Chief of Police and a letter from the Fire Department and the proposed ordinance regarding the creation of a retirement fund . . . were read and discussed. Mr. Leo Schussman, representing the Firemen, stated that the firemen had studied this proposition for over a year and had obtained ordinances from many other cities, and that the ordinance presented was made up from the favorable parts of all of these other ordinances. The plan, he stated, would go into effect for first payments at the end of five years. . . . Councilman Franceschi moved and Councilman Berry seconded that the matter be referred to the Committee of the Whole to meet with a committee from the Fire and Police Departments, the date to be set by the President of the Council. The motion carried. . . .''

language itself of the statute is sufficiently clear or free from obscurity as to reasonably remove all doubt as to its meaning or the legislative intent with respect thereto.'' Both the Pension Act and the pension ordinance of defendant City are so clear as to remove doubt as to their meaning and the legislative intent of the legislators and the people who enacted them, and each of such enactments plainly limits the City's pension liability to that of matching the pension fund contributions of the members of its police and fire departments.

*Limitation on Liability Under Pension Act*

The Pension Act provides an alternative procedure[4] by which ''Any city within this State'' is ''authorized to adopt by ordinance a retirement or pension system for its officers and employees . . .'' upon ''a majority vote of the electorate of the city or by approval of a two-thirds majority of the governing body of such city.'' (§ 1.) City employees are divided into three groups (firemen, policemen, others), and no group can be included in the retirement system unless a majority of the members thereof have expressed by secret ballot their approval of the proposed system. (§ 2.)

Section 3 of the Pension Act directs that the ordinance establishing the system shall provide for various matters, including inter alia ''(a) The amount of benefits'' and the terms and conditions of payment thereof, ''(b) The contribution to be paid'' to the retirement fund by each covered employee, and ''(c) The *contribution* to be *paid by the city* to the pension and retirement fund, *which . . . shall not exceed the total contribution* paid to the . . . fund *by the . . . employees.*'' (Italics added.)

Ordinance 2262 does provide for the amount of benefits (§§ 3, 4, etc.) and for the contribution to be paid to the fund by each employee (§ 10). It further provides (§ 10) that the City shall place in the fund *''not less than* the amount contributed'' by the employees.[5] (Italics added.)

Inasmuch as the City adopted Ordinance 2262 under and

---

[4]Pension Act, section 8: ''This act shall not be deemed to repeal any existing acts under which pension or retirement systems may have been heretofore adopted, but is intended to be and is an enabling act providing an alternative procedure for the establishment of [such] systems. . . .''

[5]As originally enacted, section 10 provided that the contribution of each employee should be *5 percent* of his regular monthly salary. *By 1959 amendment*, after prior approval of the employees, this contribution was *increased to 7 percent*, thereby automatically increasing by a like amount the City's required contributions.

**356**

pursuant to the authority of the Pension Act, the City is bound by the provisions of that act. (See *Klench* v. *Board of Pension Fund Comrs., supra,* 79 Cal.App. 171, 177, 180.) Moreover, the requirement found in section 10 of the ordinance that the City contribute *"not less* than the amount contributed each month by each member" (italics added) comports with the requirement of section 3, subdivision (c), of the Pension Act that the City's contribution shall, conversely, be *not more* than the total contributions of the employees. The voters by their approval of the ordinance thus expressed their willingness that the City make the maximum regular contribution to the pension and retirement fund which is permitted under subdivision (c) of section 3 of the Pension Act.[6] In this connection it should be noted that under section 6 of the Pension Act the City "may levy and collect annually" a special property tax "to meet the obligation of the city to the said pension and retirement fund *as defined and limited by subdivision (c) of section 3* hereof; which said rate of taxation may be in addition to the annual rate . . . allowed by law to be levied in said city." (Italics added.)

Further, under section 5 of the Pension Act the City is permitted to "enhance" the retirement fund over and beyond the required contributions, by transferring to such fund "any surplus funds of said municipality which in the sound discretion of said legislative body may properly be used for such purpose." However, by reason of the maximum imposed by the Pension Act on *required* contributions, the City cannot be compelled to contribute more.

The majority opinion *(ante,* pp. 345-348) undertakes at great length to discuss the powers of "home rule" cities such as defendant City of Eureka, and to overrule this court's opinion in *Blake* v. *City of Eureka* (1927) 201 Cal. 643 [258 P. 945], with respect to the scope and effect of section 191 of the City's charter as it existed at the times here involved.[7]

---

[6]As noted in footnote 3, *ante,* the firemen and policemen of defendant City actively participated in drafting the pension ordinance, and accordingly may fairly be credited with the section 10 provision that the City's regular contribution should be the maximum permissible under the Pension Act pursuant to which the ordinance was adopted.

[7]Charter section 191: "All improvements, actions, proceedings, matters and things not otherwise provided for in this charter *shall* be taken, had, and conducted under and in pursuance of the provisions of the laws of the State of California applicable thereto, in force at the time such improvements [etc.] are taken and had." (Italics added; Stats. 1895, p. 403.)

In 1959 the City adopted a new charter which carried over and incorporated as section 912 the provisions of section 191 of the 1895 charter.

Without here undertaking to detail the unsoundness of the majority's reasoning, it is appropriate to emphasize that since the City in actuality did proceed under general state law as found in the Pension Act here involved, there is no occasion to consider whether attempted enactment of a retirement and pension ordinance in disregard of general law would have fallen afoul of former section 191 of the charter.

*City's Liability as Expressed in Ordinance 2262*

Additionally and in any event the terms of Ordinance 2262 themselves limit the City's liability to that of matching the contributions of its covered fire and police employees. A limitation on a city's obligation to contribute to a pension fund is, of course, valid and will be given effect. (*Houghton* v. *City of Long Beach* (1958) 164 Cal.App.2d 298, 303-305 [1] [330 P.2d 918].)

In construing Ordinance 2262, it should be recalled at the outset that the general state law (Pension Act) pursuant to which it was enacted, specifies in section 2 that the retirement and pension system established by the ordinance could include no group of City employees (firemen, policemen, others) which had not previously approved the system. As noted hereinabove (see fn. 2, *ante*), the firemen and policemen of defendant City by secret ballot did approve the system.

Further, Ordinance 2262, which establishes a retirement system for *only* the police and fire departments of defendant City, who had expressed their required advance approval, itself provides (§ 17) that other municipal employees may be included in the system "only by a majority vote of such other" employees "held in accordance with" the Pension Act, *and* a majority vote of fire and police department members and of the city council; *and* if so approved for inclusion such other employees "shall be required to fulfill such demands and requirements *as fixed by the members of the Fire and Police Department and the City Council* in order to make up past contributions. . . ." (Italics added.) Moreover,

---

(Stats. 1959, pp. 5604, 5622.) In 1965 section 912 of the 1959 charter was amended to read: "Procedures. The City shall have the power to and *may* act pursuant to any procedure established by any law of the State, unless a different procedure is required by this Charter." (Italics added; Stats. 1965, p. 5307.)

Thus, by the 1965 change of the word "shall" to the word "may," in section 912, the former limitations imposed by the charter itself upon the City's power with respect to matters of municipal concern were removed. The statement to the contrary in the majority opinion (fn. 4 thereof) demonstrates a basic misunderstanding of the charter provisions.

amendments to Ordinance 2262 are by its own terms (§ 16) permitted only after previous approval thereof by a majority of the members of the fire and police departments, voting separately by secret ballot upon each proposed amendment.[8] With the original sponsorship by those departments of the fire and police retirement system of the City, and with the adoption, enlargement, and amendment of the system thus made subject to the prior approval of the members of such departments, this clearly is not an appropriate case for application of the statement from *England* v. *City of Long Beach* (1945) 27 Cal.2d 343, 348 [163 P.2d 865], cited by the majority (*ante*, p. 351), that "We must, of course, reject any theory that the provisions of the charter were designed to create an appearance of granting pensions while at the same time withholding the benefits by providing inadequate funds," or of a fiction that the City induced reliance by its fire and police departments upon reasonable expectations which the City now seeks to defeat. Instead, upon any fair view of this case, it is the City which is entitled to invoke in its own favor the principle of inducement, reliance and reasonable expectations that its employees would abide by the clear provisions of the retirement and pension system which they sponsored and in large part control. The majority opinion arrives at its result by simply omitting to discuss, and thus in effect writing out of the ordinance the provisions, hereinafter pointed out, which expressly limit the liability of the City to that of matching the contributions of its covered fire and police employees.[9]

---

[8]Section 16: "This Ordinance . . . *may be amended in the following manner*, to-wit: That any proposed improvement or amendment shall be voted upon by secret ballot in the Fire Department and Police Department, separately, . . . [and if] passed by a majority vote by each said . . . Department, then if the Council, by a majority vote, shall pass such proposed amendment, the same shall become effective and binding." (Italics added.)

[9]Although not discussed in the majority opinion, it bears mentioning that plaintiffs have advanced the patently unsound argument that if it had been intended that the City's liability would be limited to matching the employee contributions, then the ordinance would not have provided that the City contribute "*not less than* the amount contributed each month by each member" of the two covered departments. (Italics added.) But had the words "not more than" been used a conflict would have existed with the language of section 5 of the Pension Act which authorizes, but does not require, the City to enhance the fund by transfer of any surplus funds of the City.

As already noted, the quoted language "not less than" must necessarily be construed in the light of the limitation imposed by the Pension Act under which Ordinance 2262 was enacted and which restricts the City's required contribution to not more than the total employee contri-

Section 10 of the ordinance, which specifies that the contribution of each member shall be five percent of his monthly salary (7 percent by 1959 amendment), "as a basic rate," and requires the City to match such employee contribution, also states that "contributions made, either by gift, devise or from any other source, for the purpose of adding to such . . . Retirement Fund, shall be received and placed therein *without any* [employee contributions] . . . or *contribution by the City . . . to match* the same. . ." (Italics added.)

Section 11 then provides that if the donations, employee contributions, and City contributions are inadequate to pay the benefits provided by the ordinance, then the employee contributions "*may be increased by a majority vote of the members* of the Fire Department, Police Department *and Council* of the City of Eureka, *to be matched by* a similar *increase by* the *City.* . . . The *increase to be effective must have a majority vote in each Department and in the Council. If no increase is voted and* there shall *not be sufficient moneys in the Fund* to make the payments herein provided, *then* such *payments shall be reduced pro rata* . . . [but] said pro rata *reduction* . . . *can only be made by* a majority *vote of the members of each Department and the City Council and only in an amount agreed upon by said three Departments.* . . ." (Italics added.)

Thus, no increase in contributions can be required from either the covered employees or the City until after advance approval by each employee group *and* by the city council. This section 11 limitation plainly restricts the City's required contribution to that of matching the employee contributions. Particularly is this true in the light of the section 10 provision that neither the employees *nor the City* shall be required to match third-party donations to the retirement fund.

Although at first reading there might appear to be an anomaly in the declaration of section 11 that if no increase is voted and there is not sufficient money in the fund "to make the payments herein provided, then such payments shall be reduced pro rata" but only upon prior approval of the reduction and the amount thereof, by each employee group and by the city council, any seeming inconsistency disappears when that provision is weighed in the light of other pro-

butions. Additionally, other provisions of the ordinance discussed hereinbelow clearly demonstrate that the only mandatory contribution to which the City obligated itself was that of matching the contributions of the members of its fire and police departments.

visions found in Ordinance 2262. Section 3, after laying down the conditions for retirement on half pay which "shall be paid from such [retirement] Fund," then declares "that said *one-half* payable *is* the *basic rate and shall be determined* by the Commission *in accordance with the amount of money in the Fund, as hereinafter provided; . . .*" (Italics added.) As already noted, section 10 also specifies a percentage of monthly salary to be contributed by each covered employee "as a basic rate."

It is thus apparent that those who had a hand in drafting Ordinance 2262, including covered members of the fire and police departments whose prior approval of the ordinance was a prerequisite to inclusion in the retirement system, considered the contingency of insufficient money in the fund to make the pension payments provided, and concluded that in such event three options should be available:

1. By mutual consent of the members and the city council, the contributions of members and of the City could be equally increased, or

2. By mutual consent of both, benefit payments could be reduced pro rata, or

3. Full benefits could be paid until exhaustion of available moneys in the retirement fund.

This was obviously the construction placed on the ordinance by the members of the fire and police departments when they approved the 1959 amendment increasing their required contributions to 7 percent of monthly salary, from the previous 5 percent. (See *ante,* fns. 5 and 8.) Further, such a construction does no violence to the direction of section 12 of the ordinance that if a covered fireman or policeman who is not entitled to retirement benefits permanently leaves the service, his contributions to the fund, plus reasonable interest, shall be returned to him or his survivors, all of whom (§ 19) are declared to have a property interest therein for withdrawal purposes. (See also § 7.) As the City emphasizes, this requirement necessarily means that the retirement commission must at all times have and hold in the fund trust assets[10] equal in value to the total amount of contributions made by all nonretired members, plus the interest, and that such assets

---

[10]See *Jorgensen* v. *Cranston* (1962) 211 Cal.App.2d 292, 300-301 [27 Cal.Rptr. 297]; *Sheehan* v. *Board of Police Comrs.* (1922) 188 Cal. 525, 530 [206 P. 70]; cf. *Benson* v. *City of Los Angeles* (1963) 60 Cal.2d 355, 365 [8] [33 Cal.Rptr. 257, 384 P.2d 649].

are not available for payment of benefits to retired members. Further, under the declaration of section 19 of the ordinance that each member has "an estate to his dependents and heirs in a sum equivalent to the amount he shall have contributed, plus a reasonable rate of interest, less any deductions provided," the additional limitation is imposed that the contributions of each member may be used only for the purpose of providing the pension payable to him or his survivors. Thus it is only in the event that a nonretired member dies without heirs that (under §§ 7 and 12[11]) his contributions would become available (as are City contributions and third-party donations) for pension payments to retired members.

This construction of the various provisions of Ordinance 2262, many of which are not mentioned in the majority opinion, gives a practical and consistent meaning to all, and thereby accords with the intent of the ordinance taken as a whole and with one of the most basic tenets of statutory construction. Moreover, it comports with the state statute pursuant to which the ordinance was adopted. It necessarily follows that the City's liability under the ordinance is limited to matching the employee contributions and that, accordingly, the judgment should be reversed.

Traynor, C. J., and McComb, J., concurred.

Appellant's petition for a rehearing was denied October 9, 1968. Traynor, C. J., McComb, J., and Burke, J., were of the opinion that the petition should be granted.

---

[11]Both sections 7 and 12 provide that in the event of death of a member without heirs, his contributions shall remain in the retirement fund.