[Civ. No. 20487. Third Dist. Sept. 24, 1981.]

CALIFORNIA STATE EMPLOYEES' ASSOCIATION,
Petitioner, v.
KENNETH CORY, as State Controller, Respondent.

[Civ. No. 20433. Third Dist. Sept. 24, 1981.]

CWA PSYCH TECH UNION, LOCAL 11555, Petitioner, v.
KENNETH CORY, as State Controller, Respondent.

COUNSEL

Bernard L. Allamano, Kanter, Williams, Merin & Dickstein, Mark E. Merin and David B. Seals for Petitioners.

George Deukmejian, Attorney General, Richard D. Martland, Assistant Attorney General, Jeffrey J. Fuller and Talmadge Jones, Deputy Attorneys General, for Respondent.

## OPINION

**CARR, J.**—Petitioner California State Employees' Association (CSEA), a nonprofit corporation organized to represent employees of the State of California, in action number 20487, invokes the original jurisdiction of this court seeking extraordinary relief in the nature of mandamus pursuant to article VI, section 10, California Constitution and rule 56, Rules of Court. We heretofore issued an alternative writ.

*CWA Psych Tech Union, Local 11555* v. *Cory* action number 20433, was filed as an original proceeding in the Supreme Court of California and by order of that court transferred to this court with directions to issue an alternative writ of mandate. Petitioner is another state employee organization whose members are psychiatric technicians employed at California State Hospitals throughout California. We have likewise issued an alternative writ in this case.

The issues in each case are identical. We therefore, on our own motion, order the two cases consolidated on this appeal.

The issues presented are: 1) whether state employees are entitled to prejudgment interest on lump-sum salary payments allowed by Senate Bill No. 91, 1979 Regular Session (Senate Bill No. 91), and 2) whether a constructive trust arose in favor of the state employees for such interest on interest earned in the pooled money investment account from funds appropriated for salary payments by Senate Bill No. 91.

Respondent Kenneth Cory, Controller of the State of California, does not contest that each petitioner properly sues in its own name on behalf of its members or that mandamus is the appropriate remedy.

As enacted on July 2, 1979, Senate Bill No. 91 appropriated $207,669,500 from the state's General Fund and certain special funds for salary increases or augmentation made as a lump sum payment to "current employees on or after May 31, 1979, and academic year employees employed at the end of their current academic year ... equivalent to [a 7 percent salary increase from October 1, 1978, through June 30, 1979]."[1]

By petitions for writ of mandate Howard Jarvis and Armin Brodty sought a declaration that Senate Bill No. 91 was unconstitutional and

---

[1]The Governor vetoed the bill but the Legislature overrode this veto.

an order that respondent Cory refrain from expending any funds pursuant to the bill. That issue was finally determined on December 18, 1980, when the Supreme Court upheld the constitutionality of the bill, discharged the alternative writs and denied the petition. (*Jarvis v. Cory* (1980) 28 Cal.3d 562 [170 Cal.Rptr. 11, 620 P.2d 598].)

In a footnote the Supreme Court stated that "CSEA has made a motion for an award of interest at the legal rate for the period during which payment has been delayed. Inasmuch as there is no showing that respondent Cory will refuse to pay such interest, if any is due, we do not reach the merits of the motion but deny it as premature. [Citation.]" (*Jarvis v. Cory, supra*, 28 Cal.3d at p. 579, fn. 11.) In a memorandum dated December 22, 1980, from Cory to all state employees, respondent stated in reference to the Supreme Court decision that "Interest will not be included in these payments." In light of that directive the issue is now cognizable and petitioners request we issue a writ of mandate commanding respondent Cory to pay such interest.

Cory concedes state employees have a statutory right to an award of interest pursuant to section 3287 of the Civil Code.[2] (*Mass v. Board of Education* (1964) 61 Cal.2d 612, 624-625 [39 Cal.Rptr. 739, 394 P.2d 579]; *Sanders v. City of Los Angeles* (1970) 3 Cal.3d 252 [90 Cal. Rptr. 169, 475 P.2d 201]; see also *Tripp v. Swoap* (1976) 17 Cal.3d 671, 681 [131 Cal.Rptr. 789, 552 P.2d 749].) However, he contends that the Legislature has not appropriated monies for that purpose, that such power of appropriation is exclusive to the Legislature, and that in the absence of such appropriation the State Controller lacks authority to draw money from the treasury for the payment of interest; further that no constructive trust has arisen with respect to any funds appropriated by Senate Bill No. 91.

Respondent contends and we agree that neither the statute nor its legislative history indicates the Legislature anticipated the payment of interest in the event of any legal or administrative delays, and in the

---

[2]Civil Code section 3287, provides in pertinent part: "(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state."

absence of an expressed intention, none should be inferred. Respondent suggests the "best indication that the Legislature did not intend that funds appropriated by Senate Bill 91 could be utilized for the payment of interest is the fact that the Legislature subsequently passed a bill (Assembly Bill No. 1976, introduced by Assemblyman Deddeh on January 7, 1980) which contained an appropriation of $26,500,000 for the express purpose of paying interest on the payments provided for in Senate Bill 91 if Senate Bill 91 were found to be constitutional by the Supreme Court. If the Legislature had intended that Senate Bill 91 already contained such an appropriation, there would have been no need for this subsequent bill. Assembly Bill No. 1976 did not become law by reason of a veto by the Governor on July 28, 1980."[3]

Although one could reasonably speculate that the Legislature would have included a contingency provision for payment of interest had a delay in payment been anticipated, the fact remains that Senate Bill No. 91 contains no provision for appropriation of funds for payment of interest.

According to the declaration of John R. Harrigan, chief of the personnel/payroll services division of the State Controller's office, the anticipated positive balance in the Senate Bill No. 91 appropriation after disbursement of salary payments is $8,996,000. At the legal rate of 7 percent it is calculated that approximately $18 million would be required for payment of the requested interest; clearly, there are insufficient funds remaining in the original appropriation for payment of such interest, even were we to determine that interest should be paid from the original appropriation.[4] But petitioner posits that the Senate Bill No. 91 appropriation includes not only the original corpus but also the amounts earned by the state as a result of the investment of appropriated funds in the pooled money investment account. We are unable to adopt such reasoning in light of statutory and constitutional provisions

---

[3]In his veto message the Governor stated:

"*To the Members of the California Assembly*:

"I am returning Assembly Bill No. 1976 without my signature.

"This bill is premature at best. The Supreme Court has yet to rule on the constitutionality of SB 91. Furthermore, this measure should be carefully reexamined by the Legislature in light of the financial problems facing State government." (Cal. Legislature (July 20, 1980) Assem. J. (1979-1980 Reg. Sess.) p. 18446.)

[4]Petitioners contend that payment of interest is implicitly authorized by the enactment of Senate Bill No. 91. (See *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 213 [130 Cal.Rptr. 697, 551 P.2d 1]: "expenditures by an administrative official are proper only insofar as they are authorized, explicitly or implicitly, by legislative enactment.")

pertaining to investment of state funds, the nature of funds in the treasury and the limitations on the Controller's authority to draw warrants on those funds.

In 1955 the Pooled Money Investment Board was created, consisting of the Controller, Treasurer, and Director of Finance. (Stats. 1955, ch. 1703, § 1, p. 3129; Gov. Code, § 16480.1.[5])

The board is required to designate once each month the amount of money in the state treasury available for investment in securities or deposit in banks and savings and loans, or in loans to the General Fund, and the type of investment or deposit to be made. (§ 16480.1.) All money in the state treasury is appropriated for purpose of investment and deposit except that contained in the Unemployment Compensation Disability Fund. (§ 16480.)

The Treasurer, immediately after the designations by the board, must make the investments or deposits in accordance with such designations. (§ 16480.3.) In making investments he is required to use Controller's warrants, which warrants are not to be drawn upon any one fund but upon all money in the treasury. (§ 16480.5.) It is expressly provided that money available for investment or deposit must be invested in securities or deposited in banks and savings and loan associations in such a way as to realize the maximum return consistent with safe and prudent treasury management. (§ 16480.2.)

The Treasurer is authorized to sell and exchange securities obtained through investment for other authorized securities if, in his discretion, such sale or exchange appears to be in the best interests of the state. (§ 16480.4.)

As of December 31 and June 30 each year all interest earned and increment derived from investments in securities, time deposits and loans, upon order of the State Controller, must be distributed to the General Fund and the Surplus Money Investment Fund. (§ 16480.6.)

In his declaration supporting respondent's return, the current chief of the investment division of the State Treasurer's office, Kenneth R. Cramer, explained it is his duty to supervise the investment of funds in

---

[5]Unless otherwise indicated, references are to the Government Code.

the treasury, including funds available for investment in the pooled money investment account. He provided the following information:

".    .    .    .    .    .    .    .    .    .    .    .    .    .

"(2) During fiscal year 1979-80 (July 1, 1979-June 30, 1980) earnings from investments of funds in the Pooled Money Investment Account equalled $873,469,000.

"(3) During fiscal year 1979-80 earnings from investments of General Fund monies in the Pooled Money Investment Account equalled $544,275,000.

"(4) General Fund monies in the Pooled Money Investment Account are not identified with respect to particular appropriations. All money in the State Treasury is appropriated for the purpose of investment and deposit as provided in Government Code section 16480 et seq.

"(5) During the period July 2, 1979, through December 18, 1980, the earnings on investments of the Pooled Money Investment Account averaged 10.516% of the amount invested. Thus, if $207,596,000 was invested for that period of time, earnings on that amount would equal approximately $31,999,000. However, because funds are not identified with respect to specific appropriations and because different types of investments may yield differing rates of return, it is impossible to determine the exact earnings which resulted from the availability for investment of the $207,596,000 appropriated by SB 91 (Stats. 1979, ch. 192)."

Article XVI, section 7 of the California Constitution provides: "Money may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." Similarly, Government Code section 12440 provides: ". . . a warrant shall not be drawn unless authorized by law, and unless unexhausted specific appropriations provided by law are available to meet it."

Interest earned due to the availability of the Senate Bill No. 91 appropriation essentially is treasury money for which no appropriation has been legally authorized, thereby leaving the Controller without authority to draw warrants to pay interest. ■ A writ of mandate will not issue to compel performance of an act not within the power of the person to whom the writ issues. (See *McClatchy* v. *Matthews* (1901) 135

Cal. 274 [67 P. 134]; *Stracke* v. *Farquar* (1942) 20 Cal.2d 82 [124 P.2d 9].) By the year 1888 it was already "well settled that an officer cannot be compelled to pay a sum of money by mandate unless the money is in his official custody, legally subject to the payment of the demand made when the steps are initiated to enforce the payment of such demand by writ of mandate." (*People* v. *Reis* (1888) 76 Cal. 269, 275 [18 P. 309].) "In the case of *Steven* v. *Truman* [(1899)] 127 Cal. 155, ..., the rule is thus stated: 'There was no duty put upon appellant as treasurer, to pay the order unless he had funds in his control applicable to that purpose ....'" (*State Commission in Lunacy* v. *Welch* (1912) 20 Cal.App. 624, 628 [129 P. 974].)

█ Despite our inability to grant the petition we recognize petitioners' right to prejudgment interest on the payments disbursed pursuant to Senate Bill No. 91, and we presume the Legislature will give meaning to our ruling and "that the proper steps will be taken to appropriate the amount required" to pay such interest. (See *Tevis* v. *City & County of San Francisco* (1954) 43 Cal.2d 190, 200 [272 P.2d 757].)[6]

Petitioners argue that the funds invested were not state funds, but rather, the rightful property of the state employees, and that a constructive trust arose during the course of litigation. However, section 16480 provides "*all* money in the state treasury ... is appropriated for the purpose of investment and deposit." (Italics added.)[7] Although the appropriation had been made, no specific, identifiable funds were segregated from other funds in either the pooled money investment account or the General Fund at any time prior to payment. We conclude *Gonzales* v. *State of California* (1977) 68 Cal.App.3d 621 [137 Cal.Rptr. 681] is not controlling under the circumstances of this case. (See *Gama* v. *County of Kern* (1960) 179 Cal.App.2d 1, 4-5 [3 Cal.Rptr. 380].)

*Mandel* v. *Myers* (1981) 29 Cal.3d 531 [174 Cal.Rptr. 841, 629 P.2d 935], a decision filed by the California Supreme Court subsequent to oral argument herein is small solace to petitioners.

The plaintiff in *Mandel, supra*, was an employee in the Department of Health Services. In a 1973 lawsuit, she successfully challenged the

---

[6]Obviously, the state has greatly benefited by use of funds not paid out during litigation. Indeed, as respondent states, "payment of interest to state employees for delays occasioned by litigation [is] equitable and meritorious."

[7]By contrast section 16480 provides with respect to specified treasury trust accounts that "all *state* money" is appropriated for investment and deposit.

constitutionality of the department's practice of allowing employees three hours of paid time off on Good Friday and secured a judgment enjoining the State Controller from paying state employees for time off on Good Friday. Included in the judgment was an attorneys' fee award of $25,000. Repeated efforts to secure payment of this sum were unsuccessful[8] until plaintiff secured a court order directing the Controller to pay the attorney fee award out of funds appropriated in the 1978-1979 Budget Act for the operating expenses of the Department of Health Services.

In affirming the trial court, the Supreme Court determined that the order in question did not compel the Legislature to appropriate funds or to perform any other legislative act which might violate the separation of powers principle but simply directed the Controller, a state official, to pay a specified sum from already appropriated funds. Further, that the "operating expenses and equipment" category of the Department of Health Services budget was sufficiently broad, as defined by the 1978-1979 Budget Act, to encompass court-awarded attorney fees.

In the cases at bar, the interest in question is calculated at some $18 million, hardly a small-change operating budget item. There is no extant appropriation by the Legislature from which to order payment. As we have stated, we find no legislative intent that the original appropriation included any payment of interest. The lack of sufficient funds in that appropriation to pay the full interest is further indicia of the absence of such legislative intent. The issue confronting us is not the refusal of the Controller to pay a final judgment from available appropriated funds but a refusal to pay because there are no available appropriated funds. The Legislature has previously demonstrated its willingness to consider and in fact to appropriate funds for the interest payments in question. The Governor's veto was, in part at least, based on the premature nature of the legislation as the constitutionality of Senate Bill No. 91 was yet to be finally determined. The issue has now ripened; petitioners' members are entitled to prejudgment interest. The

---

[8]When the judgment became final, plaintiff, upon advice of the Attorney General, presented a claim for $25,000 to the State Board of Control. The claim was approved and an appropriation for it was included in an omnibus claim bill. It was deleted on advice of the Legislative Analyst. A claim filed the next year was again approved by the Board of Control and a specific appropriation for payment thereof was requested in the budget. Again, the Legislative Analyst recommended deletion, apparently on his own reevaluation of the merits of the award and the appropriation was again deleted from the budget by the Legislature.

payment thereof must be preceded by a legislative appropriation of the necessary sums.

The alternative writs of mandate are discharged and the petitions are denied.

Regan, Acting P. J., and Blease, J., concurred.

Petitioner's application in No. 20433 for a hearing by the Supreme Court was denied January 14, 1982. Bird, C. J., and Kaus, J., did not participate therein. Taylor, J.,* Caldecott, J.,* and Newsom, J.,* participated therein. Broussard, Acting C. J., Mosk, J., and Newsom, J.,* were of the opinion that the application should be granted.

---

*Assigned by the Acting Chairperson of the Judicial Council.