[Civ. No. 21654. Third Dist. Feb. 9, 1983.]

CHARLES P. VALDES et al., Petitioners, v.
KENNETH CORY, as State Controller et al., Respondents;
MARY ANN GRAVES, as Director, etc., Real Party in Interest.

CALIFORNIA SCHOOL EMPLOYEES' ASSOCIATION et al.,
Petitioners, v.
KENNETH CORY, as State Controller et al., Respondents;
MARY ANN GRAVES, as Director, etc., Real Party in Interest.

COUNSEL

Bernard L. Allamano, Gary P. Reynolds, Bradley G. Booth, Christine A. Bologna, Peter A. Janiak, Maureen C. Whelan, Madalyn Frazzini, E. Luis Saenz, Siona D. Windsor and Janae H. Novotny for Petitioners.

Davis, Cowell & Bowe and Alan C. Davis as Amici Curiae on behalf of Petitioners.

Morrison & Foerster, James J. Brosnahan, F. Bruce Dodge, Pamela R. Federman, Stephen J. Schrader, Bruce Teicher, Gerald Ross Adams, Charles I. Gibbs, Roland K. Bowns, John Breen, Thomas A. Aceituno, Cynthia G. Besemer, Dennis A. Barlow, County Counsel, Timothy P. Hayes, Chief Deputy County Counsel, Breon, Galgani, Godino & O'Donnell, Robert A. Galgani, Walters, Bukey & Shelburne, John L. Bukey, Thomas Nussbaum, Catherine Close, Gerald A. Sherwin, County Counsel, Mark F. Ornellas, Deputy County Counsel, Thomas M. Griffin and Roger D. Wolfertz for Respondents.

Russell Iungerich and Judith M. Mitchell for Real Party in Interest.

## OPINION

**PUGLIA, P. J.**—In consolidated original mandamus proceedings, various members of the Public Employees' Retirement System (PERS) and their employee organizations challenge, on constitutional and other legal grounds, the validity of certain provisions of chapter 115 of the Statutes of 1982. They seek peremptory writs of mandate to compel respondents, State Controller Kenneth Cory, the PERS Board of Administration (PERS Board), and the respective school employers of the school-employee petitioners, to perform their legal duties without regard to the challenged provisions of chapter 115. All respondents support the crux of the petitioners' attack on the challenged provisions of chapter 115 as does amicus curiae Federated Fire Fighters of California. Intervening as real party in interest, Mary Ann Graves, the then Director of Finance (Director), has answered and submitted arguments in opposition to petitioners. (Graves has since been succeeded as Director of Finance.)

Petitioners Valdes, Collins, and Coan are either active or retired state employees who are members of PERS; they are joined in these proceedings by their employee organization, California State Employees' Association (CSEA), a state employee's organization operating as a nonprofit corporation under the laws of California. Petitioners Mutoza, Rao, Wilde, Anderson, Kobb, Rivera, Sinogui, and Brooks are either active or retired, classified (nonteaching) employees of various public school or community college districts and are all current members of PERS; joining them as a petitioner is their employee organization, California School Employees' Association, a nonprofit California corporation having as its primary purpose the representation of classified school employees throughout California.

Petitioners CSEA and California School Employee's Association are properly before this court in their representative capacity. (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 341 [124 Cal.Rptr. 513, 540 P.2d 609]; *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 283-284 [32 Cal.Rptr. 830, 384 P.2d 158].)

Chapter 115 of the Statutes of 1982 was introduced as Assembly Bill No. 1253 and entitled "Fiscal Affairs;" the act became effective on March 13, 1982, as urgency legislation (ch. 115, § 67) designed to balance the fiscal year 1981-1982 budget and to avoid a year-end deficit. The provisions of chapter 115 under scrutiny here are sections 58, 59, 60, and 61 and section 14, subdivision (b). These sections directly affect the method of PERS funding under the Public Employees' Retirement Law (Gov. Code, § 20000 et seq.; all citations to sections of an unspecified code are to the Government Code).[1]

---

[1]The full text of the contested provisions of chapter 115 (as amended, Stats. 1982, ch. 330, §§ 35, 36, eff. June 30, 1982) is as follows:

Section 14, subdivision (b): "Notwithstanding any other provisions of law, the employer contributions by school districts, county superintendents of schools, and community college districts to the Public Employees' Retirement Fund shall be reduced by 0.410 percent of covered members' earnings reported during the period July 1, 1981, through June 30, 1982. It is the intent of the Legislature that this percentage represents the aggregate amounts necessary to fund the cost-of-living adjustments provided by Chapter 1170 of the Statutes of 1978, Chapter 1036 of the Statutes of 1979, and Chapter 799 of the Statutes of 1980. The Board of Administration of the Public Employees' Retirement System shall make any adjustments or refunds to school districts, county superintendents of schools, and community college districts necessary to implement this section. Any adjustments or refunds shall be made from the reserve against deficiencies."

Section 58: "Notwithstanding any other provisions of law, the Controller shall not pay the state employer contributions for employees whose compensation is payable from the General Fund to the Public Employees' Retirement System for the months of April through June, inclusive, of 1982.

"The funds appropriated from the General Fund for transfer to the Public Employees' Retirement fund for the months of April through June, inclusive, of 1982 shall revert to the unappropriated surplus of the General Fund.

"The Board of Administration of the Public Employees' Retirement System shall transfer an amount equal to the amount which would otherwise be paid into the Public Employees' Retirement Fund but for the provisions of this section and Section 59 from the reserve against deficiencies to the unallocated portion of the Public Employees' Retirement Fund."

Section 59: "Notwithstanding any other provisions of law, no school district, county office of edcuation, or community college district shall pay the employer contributions to the Public Employees' Retirement System for the months of April through June, inclusive, of 1982."

Section 60: "(a) Notwithstanding any other provision of law, the Superintendent of Public Instruction shall make the computations prescribed by this section.

"(b) The superintendent shall compute the amount to be apportioned to each school district, and the amount to be allocated to each county office of education, for the second principal apportionment according to law.

"(c) The superintendent shall reduce each apportionment and allocation computed pursuant to subdivision (b) by the amount for each school district and county office of education which is not paid for that district or office to the Public Employees' Retirement System pursuant to Section 59 for the 1981-82 fiscal year, exclusive of the amount of the federal share of employer contributions to the Public Employees' Retirement System, as certified by the county superintendents, for employees supported by federal funds provided for a specific purpose and subject to

Section 58 prohibits the payment of state-employer contributions from the state general fund to the Public Employees' Retirement Fund for the months of April, May, and June 1982. These state-employer contributions were previously appropriated for PERS funding in the 1981-1982 budget (see also § 20751); section 58 purports to effect their reversion to the unappropriated surplus of the General Fund.

Similarly, section 59 of chapter 115 ceases school-employer contributions to PERS for the months of April, May, and June 1982; sections 60 and 61 provide a mechanism for the reversion of state monies, otherwise specially allocated as monthly school-employer contributions to PERS (see Stats. 1981, ch. 99, items 610-101-001; 687-101-001), to the unappropriated surplus of the General Fund.

Section 58 further requires the PERS Board to transfer an amount equal to that which would otherwise be paid by state and school employers as their three-month contributions to PERS, from the "reserve against deficiencies" portion of the Public Employees' Retirement Fund to its unallocated portion. Section 14, subdivision (b), of chapter 115 mandates a .41 percent reduction retroactive to July 1, 1981, of previously appropriated employer contributions by school districts, county school superintendents, and community college

---

federal supplanting restrictions. The apportionments and allocations shall be made as reduced pursuant to this subdivision. For purposes of accounting for this reduction, school districts and county offices of education shall determine the pro rata share of the reduction for each separate funding source of fund, and make the appropriate transfer.

"(d) The superintendent shall compute the sum of the reductions made pursuant to subdivision (c) and shall certify that sum to the Controller.

"(e) The amount certified pursuant to subdivision (d) shall not be transferred by the Controller from the General Fund to Section A of the State School Fund pursuant to Item 610-101-001 of the Budget Act of 1981 but shall instead be reverted to the unappropriated surplus of the General Fund."

Section 61: "(a) Notwithstanding any other provisions of law, the Chancellor of the California Community Colleges shall make the computations prescribed by this section.

"(b) The chancellor shall compute the amount to be apportioned to each community college district for the second principal apportionment according to law.

"(c) The chancellor shall reduce each apportionment computed pursuant to subdivision (b) by the amount for each community college district which is not paid for that district to the Public Employees' Retirement System pursuant to Section 59 for the 1981-82 fiscal year, exclusive of the amount of the federal share of employer contributions to the Public Employees' Retirement System, for employees supported by federal funds provided for a specific purpose and subject to federal supplanting restrictions.The apportionments shall be made as reduced pursuant to this subdivision. For purposes of accounting for this reduction, each community college district shall determine the pro rata share of the reduction for each separate funding source or fund, and make the appropriate transfer.

"(d) The chancellor shall compute the sum of the reductions made pursuant to subdivision (c) and shall certify that sum to the Controller.

"(e) The amount certified pursuant to subdivision (d) shall not be transferred by the Controller from the General Fund to Section B of the State School Fund pursuant to Item 687-101-001 of the Budget Act of 1981 but shall instead be reverted to the unappropriated surplus of the General Fund."

districts for the entire 1981-1982 fiscal year. This subdivision similarly directs the PERS Board to make commensurate adjustments or refunds from its reserve against deficiencies.

According to the Conference Committee Report on Assembly Bill No. 1253, the elimination of three months of state and school-employer contributions to the PERS would result in a total savings to the state general fund of $180 million ($105 million in state contributions for state employees and $75 million in state contributions for school employees), with an additional $7 million savings by operation of section 14, subdivision (b). There would be a corresponding diminution in the PERS reserve against deficiencies account, currently estimated by the chief actuary of the PERS to contain approximately $950 million. No provision is made for future replacement of this amount in the reserve account.

On March 17, 1982, the PERS Board adopted a resolution declining to transfer the approximately $180 million equal to employer contributions for three months from the reserve against deficiencies account to the unallocated portion of the PERS fund until a final judgment by an appellate court orders the board to do so.[2] Shortly thereafter, respondent Cory announced he would comply with the provisions of chapter 115 which prohibit him from paying employer contributions to PERS, explaining that as State Controller, he is ". . . bound to follow the laws enacted by the Legislature unless and until the courts determine otherwise." Under section 20754, the Controller would otherwise be obliged to transfer state monthly contributions from the general fund and other obligated funds in the state treasury to the PERS fund.

The present petitions invoking the original jurisdiction of this court ensued. We issued alternative writs of mandamus but declined to issue a stay pending our review.

■ Petitioners have properly invoked our original mandate jurisdiction under article VI, section 10, of the California Constitution and California Rules of Court, rule 56. The constitutional questions presented here are of great public importance deserving prompt resolution (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281]; *California Housing Finance Agency v. Elliott*

---

[2]The Director of Finance argues the PERS Board is not a proper party respondent since petitioners do not urge that the board be compelled to perform any act. In reply the board implicitly acknowledges the anomaly of its position as respondent but asserts it has an interest in the litigation "closely aligned to the petitioners and . . . adverse to the position of [the Director]." However its position in these proceedings is characterized, the board has a substantial and direct interest in the success of petitioners. (See Code Civ. Proc., § 387; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 196, pp. 1869-1871.)

(1976) 17 Cal.3d 575, 579-580 [131 Cal.Rptr. 361, 551 P.2d 1193].) Moreover, the named respondents are under a constitutional duty to comply with the contested provisions of chapter 115 unless and until an appellate court declares them unconstitutional. (Cal. Const., art. III, § 3.5.)

We shall uphold petitioners' contention that the challenged provisions of chapter 115 violate the constitutional prohibition against impairment of contract. Accordingly, we shall order a peremptory writ to issue directing respondents to perform their duties without regard to the unconstitutional provisions of chapter 115.

Petitioners also contend that the challenged sections of chapter 115 violate the statutory provisions codified in section 20000 et seq. and general principles of trust law. ■ We address only the claim of unconstitutional impairment of contract for it is elementary that the Legislature has power, absent constitutional restrictions, expressly to amend or repeal both the common law and existing statutes. ■ ■■■ (See Civ. Code, § 22.2; see also generally 58 Cal.Jur.3d, Statutes, §§ 4, 5.)[3]

An understanding of the Public Employees' Retirement Law and its legislative history is critical in reaching a disposition of the constitutional issues involved. In 1929, a legislatively created commission on pensions (Stats. 1927, ch. 431) recommended the establishment of a retirement system for state employees. (Rep. of the Com. on Pensions of State Employees, 1929.) This report stressed the need to place a retirement system on a "sound financial basis, where liabilities are provided for as they are *incurred,* rather than when they mature," and periodically to investigate the "actual experience of the system as compared with the 'expected' experience worked out by the actuaries." (Italics in original; *id.,* at p. 9.)

On November 4, 1930, a constitutional amendment was passed empowering the Legislature to provide for the payment of retirement salaries to state employees. (Former Cal. Const., art. IV, § 22a; repealed Nov. 8, 1966.) In consequence, the Legislature established the State Employees' Retirement

---

[3]Without extensive argument, petitioners suggest there is another constitutional infirmity in chapter 115 in that it embraces more than one subject in violation of article IV, section 9, of the California Constitution. They argue that the title of chapter 115, "Fiscal Affairs," is not "reasonably germane" to the affirmative duties imposed on the board by section 58 and section 14, subdivision (b), thereof. Since our conclusion under a contract impairment analysis is fully dispositive of these proceedings, it is unnecessary to deal definitively with this alternate constitutional theory. However, we do note that under the broad "reasonably germane" test recently reiterated by the Supreme Court in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pages 229-232, the single-subject requirement is met if the legislation under scrutiny exhibits a single scheme whereby its various provisions interrelate sufficiently to achieve a common underlying purpose. Here, the provisions of chapter 115 do interrelate and are promotive of a common purpose—balancing the state budget.

System, effective January 1, 1932. (Stats. 1931, ch. 700, § 25.) The express purpose of the retirement law was to ". . . effect economy and efficiency in the public service by providing a means whereby employees who become superannuated or otherwise incapacitated may, without hardship or prejudice, be replaced by more capable employees, and to that end providing a retirement system consisting of retirement compensation and death benefits." (Ch. 700, § 1.) This language remains intact under the current Public Employees' Retirement Law. (§ 20001.)

During the early evolution of the retirement law, a fundamental change occurred in the method of computing a pensioner's benefits. The original legislation created a benefit system commonly referred to as a money purchase plan; the amount of benefit depended on the amount of money in the pensioner's account at the time of retirement. (See Stats. 1931, ch. 700, §§ 81-83.) In 1947, the system shifted to a defined benefit plan, which by formula fixed a specific sum a pensioner was to receive upon retirement. (Stats. 1947, ch. 732.) This system remains under current law. (§ 21250 et seq.)

To manage the retirement "trust" fund, the Legislature in 1931 vested a board of administration with broad and exclusive control over the administration and investment of the retirement system's funds. (Stats. 1931, ch. 700, §§ 42, 59-62.) The board is charged with periodic investigative and reporting responsibilities relating to the actuarial valuation and financial status of the system. (Ch. 700, § 51.) These general powers and duties remain in the same or similar form under current law. (See §§ 20201, 20202, 20203, 20205, 20127, 20140, 20206.5, 20231.)

From its inception, the retirement law has provided a systematic method for joint prefunding of pension benefits via individual member and employer contributions. Membership in the retirement system originally was and still is compulsory. (Stats. 1931, ch. 700, §§ 6-28; § 20300 et seq.) Over the years the categories of covered employees have expanded now to encompass most employees of cities, counties, school districts, and other public agencies.[4] (§§ 20010, 20302.5, 20740.) Individual member contributions, although varying in the particular rates specified for various classes of public employees, likewise have always been compulsory. (Stats. 1931, ch. 700, §§ 65, 66; Gov. Code, § 20600 et seq.)

---

[4]The inclusion of local public employees also is reflected in the change in name from the "State Employees' Retirement System" to "Public Employees' Retirement System." (Stats. 1967, ch. 84, § 2; see also § 20002.) Political subdivisions of the state may either contract with PERS or adopt their own retirement system. (See §§ 20332, 20490.) Cities electing to adopt their own retirement systems must do so on a "sound actuarial basis. . . ." (§ 45342.)

Initially, employer contributions were not set at fixed rates (see Stats. 1931, ch. 700, §§ 65-74, 108, 109), but as early as 1947, the Legislature specified actuarially determined, compulsory employer contributions. (Stats. 1947, ch. 1267, § 1.) In 1968, legislation empowered the board periodically to adjust the rates of employer contributions in accordance with its actuarial valuations. (Stats. 1967, ch. 1631, §§ 29, 35, operative July 1, 1968.) The current statute reads: ". . . Rates of [public employer] contributions as fixed under this chapter shall be adjusted thereafter from time to time by the board pursuant to actuarial valuation of the liability for benefits on account of the employees of all public employers. Any adjustment of such rate of contribution shall be effective on the July 1 following notice as provided in this section. The board shall report such adjustment to the Governor, the Legislature, and the governing body of every other public employer before March 1 of the fiscal year preceding that in which the adjustment becomes effective." (§ 20750.9.) These rates have been revised over the years and are now codified in sections 20741 et seq. Government Code sections 20751 and 20752 provide for monthly appropriation from the general fund and the state treasury to the retirement fund of state employer contributions. Section 20754 requires the State Controller monthly to transfer such appropriated state contributions to the retirement fund.

The original pension law expressly provided that contributory payments of the state were "obligations of the state." (Stats. 1931, ch. 700, § 74.) The 1933 amended version of the law declared that such payments "are hereby made and *shall continue to be* obligations of the State." (Stats. 1933, ch. 473, § 24; italics added.) The current statute provides that such payments are "*continuing* obligations of the State." (Italics added; § 20757.)

In addition, the retirement law always has provided that accumulated employee-employer contributions are to be ". . . held for the benefit of members . . . ." (Stats. 1931, ch. 700, § 56; see also §§ 20758-20759.1.) Section 20200 further declares that the PERS fund ". . . is a trust fund created, and administered . . . solely for the benefit of the members and retired members of the system and their survivors and beneficiaries." (Stats. 1978, ch. 231, § 1.)

The retirement law provides for crediting each member's contribution, together with regular interest, to an individual account of the member. (Stats. 1931, ch. 700, § 67; §§ 20684, 20131.) Since 1937, the board has been required to apply excess income to a reserve account within the retirement system (Stats. 1937, ch. 806, § 8). Until recently amended, section 20203 provided: "Income, of whatever nature, earned on the Retirement Fund during any fiscal year, in excess of the interest credited to contributions during that year shall be retained in the fund as a reserve against deficiencies in interest earned in other years, losses under investments, and other contingencies." (Stats. 1955,

ch. 1705, § 5.) The current law contains a similar requirement; present section 20203 (as amended, Stats. 1982, ch. 330, § 14, eff. June 30, 1982) now provides that such earned income in excess of credited interest "be retained in the fund as a reserve against deficiencies in interest earned in other years, and losses under investments."

The PERS Board credits member accounts at annually fixed rates of interest. (§§ 20026, 20026.1, 20026.2, 20131.) The reserve against deficiencies portion of the PERS fund is comprised of accumulated interest or other income in excess of interest credited to contributions during any one fiscal year. (§ 20203.) For years, the interest credited to accumulated contributions closely paralleled the actual earnings rate after deduction of administrative costs. Until 1971, the crediting rate was usually within one quarter of 1 percent of the earnings rate. In recent years, however, the crediting rate has not kept pace with market rates of interest, resulting in a dramatic increase in the reserve account because of current record-high investment yields in financial markets. Consequently, the PERS currently has a reserve approaching $1 billion.

We turn now to a consideration of the constitutional argument advanced by petitioners and supported by respondents.

I

Petitioners maintain that the provisions of chapter 115 directing respondents to suspend periodic state funding of the retirement plan constitute an impairment of contractual relationships between employees who are members of PERS and their public employers in violation of article I, section 9, of the California Constitution and article I, section 10, clause 1, of the United States Constitution.

The United States Constitution prohibits a state from passing a ". . . law impairing the obligation of contracts." (Art. I, § 10, cl. 1.) The California Constitution contains a parallel proscription. (Art. I, § 9.) Under well-settled principles, these contract clauses limit the power of a state to modify its own contracts with other parties. (*United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 17 [52 L.Ed.2d 92, 106, 97 S.Ct. 1505]; *Lyon* v. *Flournoy* (1969) 271 Cal.App.2d 774, 779 [76 Cal.Rptr. 869].)

While some jurisdictions view public employees' retirement rights as a gratuity (see cases collected in Annot., 52 A.L.R.2d 437), a long line of California decisions establishes that "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the

employing public entity." (*Betts* v. *Board of Administration* (1978) 21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614]; *Miller* v. *State of California* (1977) 18 Cal.3d 808, 815-816 [135 Cal.Rptr. 386, 557 P.2d 970]; *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 852-853 [179 Cal.Rptr. 799]; *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 325 [182 Cal.Rptr. 506, 644 P.2d 192]; *Frank* v. *Board of Administration* (1976) 56 Cal.App.3d 236, 242 [128 Cal. Rptr. 378].) Thus in California, "Earned benefits are deferred compensation . . . and, when payable become a fixed indebtedness of the employer." (Fn. omitted; *Carman, supra,* 31 Cal.3d at p. 325.)

Under settled California law, "[t]he employee does not obtain, prior to retirement, any absolute right to fixed or specific benefits, but only to a 'substantial or reasonable pension.'" (*Betts, supra,* at p. 863, quoting *Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180, 183 [265 P.2d 884].) "'An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, *and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.*'" (Italics in original; *Betts, supra,* at p. 864, quoting *Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128, 131 [287 P.2d 765].)

The Director of Finance correctly draws a distinction between ". . . the right to receive pension benefits and the funding method adopted by the Legislature to assure that monies are available for the payment of such benefits." (*Kosa* v. *Treasurer of the State of Mich.* (1980) 408 Mich. 356 [292 N.W.2d 452, 460].) To date, practically all California cases applying the *Allen-Betts* reasonableness test have dealt with the right to receive benefits. Only three California cases which have come to our attention deal with the method of funding pension liabilities and these three cases concern increases in employee contributions.

In *Allen, supra,* 45 Cal.2d 128, an amendment to a city charter provision raised the rate of a current employee's contribution to the city pension fund from 2 to 10 percent of his salary without any corresponding increase in the benefits he would receive upon retirement. The *Allen* court held the increase to be an unconstitutional impairment. (45 Cal.2d at p. 131.) *Wisley* v. *City of San Diego* (1961) 188 Cal.App.2d 482, 485-487 [10 Cal.Rptr. 765], similarly held that an increase in a current city employee's contributions to a retirement fund from 1 to 8 percent of his salary, without a corresponding increase in future benefits, was unconstitutional. (See also *Singer* v. *City of Topeka* (1980) 227

Kan. 356 [607 P.2d 467]; *Brazelton* v. *Kansas Public Emp. Retirement* (1980) 227 Kan. 443 [607 P.2d 510]; and *Marvel* v. *Dannemann* (D. Del. 1980) 490 F.Supp. 170, all applying the California *Allen* rule in comparable situations.) *City of Downey* v. *Board of Administration* (1975) 47 Cal.App.3d 621, 631-633 [121 Cal.Rptr. 295], held that 1971 amendments to the Public Employees' Retirement Law, while increasing the rate of contribution of each employee to the system, did provide offsetting increases in retirement allowances and thus were constitutional.

In contrast to the three cases discussed above in which substantial increases in the cost of pension protection were directly imposed on the *employee,* we are concerned here with a unilateral act by the state which reduces its relative share as *employer* of the cost of employee pension protection contrary to established policies and procedures of longstanding which, since creation of the PERS, have had the force of law. The employee has no out-of-pocket losses from suspension of employer contributions, because PERS benefits are defined by statutory formula at the time of employment. Rather the interest of the employee at issue here is in the security and integrity of the funds available to pay future benefits. While language of general applicability can be found in *Miller* v. *State of California, supra,* 18 Cal.3d at page 816 and *Betts, supra,* 21 Cal.3d at page 864, as to limitations on the constitutionally permissible modification of a "pension system" during an employee's tenure, none of the California cases are on point factually and therefore are not controlling under the present circumstances. Authority is not lacking, however, for the proposition that employee pension beneficiaries have a vested interest in the integrity and security of the source of funding for the payment of benefits (*Sgaglione* v. *Levitt* (1975) 37 N.Y.2d 507 [375 H.L.S. 2d 79, 337 N.E.2d 592, 594-595]; *Weaver* v. *Evans* (1972) 80 Wn.2d 461 [495 P.2d 639, 649-650]; *State Teachers' Retirement Board* v. *Giessel* (1960) 12 Wis.2d 5 [106 N.W.2d 301, 305]).

Our analysis requires a two-step inquiry into: (1) the nature and extent of any contractual obligation on the part of public employers to fund PERS (see *Kern* v. *City of Long Beach, supra,* 29 Cal.2d at p. 850; *Tron* v. *Condello* (S.D.N.Y. 1976) 427 F.Supp. 1175, 1186; *Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 244-245 [57 L.Ed.2d 727, 736-737, 98 S.Ct. 2716]) and (2) the scope of the Legislature's power to modify any such obligation.

Petitioners assert that public employees under PERS have a contractual right created by statute to the maintenance of an actuarially sound pension system. The current provisions of the retirement law contain no explicit legislative commitment to an actuarially sound system.[5] However, our review of the present

---

[5] Cf. section 45342 (see fn. 4, *ante,* p. 781) which requires cities which elect to adopt their own retirement system to do so on a "sound actuarial basis."

law, its statutory antecedents and the legislative history dispel any doubt that the Legislature intended to create and maintain the PERS on a sound actuarial basis (see, e.g., § 20750.9, text, p. 782, *ante*). Having delivered ourselves of this dictum we confess that the record before us is woefully incomplete and inadequate as a basis upon which to determine whether the disputed provisions of chapter 115 do in fact impair the actuarial soundness of the PERS. (Cf. *Dombrowski* v. *City of Philadelphia* (1968) 431 Pa. 199 [245 A.2d 238, 239-240], wherein the trial court after evidentiary hearing made a finding that city appropriations were "insufficient to maintain its retirement system on an actuarially sound footing" [p. 240] in violation of Philadelphia's Home Rule Charter which contained covenant language requiring an "actuarially sound pension and retirement system.")

We therefore turn to consideration of the contention that the state has a statutorily created contractual obligation, impaired by operation of chapter 115, to make systematic, substantial monthly contributions to the PERS fund in order to fund pension benefits as liability therefor is incurred. To determine whether there is such a contractual obligation on the part of the public employer, we must look to the legislative history and current provisions of the retirement law. A statute will be treated as a contract with binding obligations when the statutory language and circumstances accompanying its passage clearly ". . . evince a legislative intent to create private rights of a contractual nature enforceable against the State." (*United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 17, fn. 14 [52 L.Ed.2d at p. 106]; *Kern* v. *City of Long Beach, supra,* 29 Cal.2d at pp. 850-851; *Taylor* v. *Board of Education* (1939) 31 Cal.App.2d 734, 742 [89 P.2d 148]; see also 58 Cal.Jur.3d, Statutes, § 28.) In respect to retirement benefits specifically, the Supreme Court has recently characterized the statutory pension provisions of a public employer as " 'an integral part of the employment contract' " which "Where feasible . . . should be construed as providing adequate funds to meet employees' reasonable expectations. [Citation]." (*Carman* v. *Alvord, supra,* 31 Cal.3d, at p. 332.)

*Carman* also makes the point that a public employer can discharge pension liabilities from current revenue as they accrue or it can insure them through PERS, contributions to which "are in the nature of insurance premiums (§ 20456); during the contract term they represent the employer's ongoing share of the actuarial equivalent of amounts necessary to fund current and future benefits due covered employees . . . . (See, e.g., §§ 20564, 20750 et seq.) From premiums paid by all, PERS discharges each employer's indebtedness as it arises (§ 21200 et seq.)" (*Carman, supra,* 31 Cal.3d at p. 325.)

We have heretofore identified specific provisions of the Public Employees' Retirement Law which demonstrate a commitment on the part of the state to

fund PERS as the state's liability for pension benefits arises. Employer contribution rates, based on actuarial recommendations by the board, are codified in section 20741 et seq. Sections 20751 and 20752 then expressly provide for monthly appropriation of employer contributions to the retirement fund and section 20757 declares, as it has virtually since the inception of PERS, that such monthly payments are "continuing obligations of the State."[6] Indeed the directive in section 58 of chapter 115 that amounts equivalent to the suspended monthly payments to PERS be transferred from the reserve against deficiencies to the unallocated portion of the retirement fund may be taken as implicit legislative acknowledgement of the state's continuing obligation to make substantial monthly payments to the funds.

Moreover, the provisions imposing upon the board, as trustee of the PERS fund, the duties of actuarial investigation and reporting as well as the power to adjust employer rates of contribution pursuant to these actuarial valuations (§§ 20127, 20140, 20206.5, 20231, 20750.9) manifest an intent that periodic employer contributions will not be altered absent actuarial input from the board in a timely manner.

We conclude the state and other public employers are contractually bound in a constitutional sense to pay the withheld appropriations to the PERS fund. The explicit language in the retirement law constitutes a contractual obligation on the part of the state as employer to abide by its "continuing obligation" (§ 20757) to make the statutorily set payment of monthly contributions to PERS unless and until such time as the board *or* the Legislature, after due consideration of the actuarial recommendations by the board, deems such contributions inappropriate. Absent actuarial input from the board in the manner set forth by Government Code section 20750.9, legislative action randomly and unilaterally cancelling or decreasing otherwise continuously appropriated, periodic employer contributions clearly interferes with vested contractual rights of PERS members. There is nothing in the record to indicate that the Legislature consulted or received guidance from the PERS Board relative to the actuarial consequences of the "emergency" provisions of chapter 115 prior to their enactment.

The Director of Finance insists that the state has not defaulted in its continuing·obligation to make monthly payments; chapter 115 merely changes the

---

[6]Respondent Cory also argues that the state's conduct over the past ·50 years confirms its obligation to make substantial monthly contributions to PERS. From 1977 until mid-1981, a pamphlet was distributed to state employees which stated in substance: "WHO PAYS FOR THESE PERS BENEFITS?

"2. The State's Contributions—To guarantee the payment of your benefits, the State (as your employer) also contributes an amount each month well in excess of your contributions."

This pamphlet was revised in 1981 and currently informs workers: "As a member of PERS, a. portion of your monthly pay is deducted each month to put into the Retirement Fund. In addition, the State, as your employer, contributes a substantial amount on your behalf each month."

source of these contributions from the general fund to the PERS reserve against deficiences. The director misconceives the nature of the reserve against deficiencies.

Once paid, appropriated employer contributions constitute a trust fund held solely for the benefit of PERS members and beneficiaries (§ 20200). Income in excess of interest credited to employee and employer accounts is to be retained in that trust fund as a reserve against deficiencies. The reserve constitutes an integral part of that trust fund. (§ 20203.) Consequently, none of the funds within PERS including those in the reserve against deficiencies, may be appropriated for a general public purpose unrelated to the benefit of PERS members (*Gillum* v. *Johnson* (1936) 7 Cal.2d 744 [62 P.2d 1037, 108 A.L.R. 595]), because funds received into the treasury for special trust purposes are "in their nature a continuing appropriation for a specific purpose" (p. 758; *Daugherty* v. *Riley* (1934) 1 Cal.2d 298, 308 [34 P.2d 1005]).[7]

Had the Legislature actually appropriated any of the PERS trust funds for purposes unrelated to the benefit of PERS members, e.g., to balance the state budget and avoid a year-end deficit, we would have no difficulty in concluding that such legislative action modified vested rights of PERS members. (See *Sgaglione* v. *Levitt, supra,* 337 N.E.2d 592; *State Teachers' Retirement Board* v. *Giessel, supra,* 106 N.W.2d 301; cf. *Whitmire* v. *City of Eureka* (1972) 29 Cal.App.3d 28, 34 [105 Cal.Rptr. 185].) When instead the Legislature directs that funds held in trust for the exclusive benefit of the members and beneficiaries of PERS be used to satisfy the state's contractual obligations to make

---

[7]The Director of Finance contends that the state's fiscal crisis qualifies as a "contingency" within the meaning of former Government Code section 20203 so as to permit the state to use reserve funds to satisfy its obligation to make monthly payments to PERS. At the time chapter 115 was enacted, section 20203 provided that reserve funds ". . . shall be retained . . . as a reserve against deficiencies in interest earned . . . losses under investments, and other contingencies." (The last clause of the quoted passage, "and other contingencies," was deleted by amendment (Stats. 1982, ch. 330, § 14, eff. July 1, 1982) and does not appear in the current version of the section.)

Words in a statute must be read in context with the nature and purpose of the statute as a whole. (58 Cal.Jur.3d, Statutes, § 102; *Steilberg* v. *Lackner* (1977) 69 Cal.App.3d 780, 785 [138 Cal.Rptr. 378].) The word "contingency" must be interpreted in light of the underlying legislative purpose of section 20000 to establish a retirement system for the *benefit* of public employees. A fundamental rule of statutory construction, *ejusdem generis,* requires general words following the enumeration of particular classes of persons or things to be construed ". . . as applicable only to persons or things of the same general nature or class as those enumerated; . . ." (58 Cal.Jur.3d, Statutes, § 130.) The rule is ". . . founded on the idea that if the general words were intended to prevail in their full and unrestricted sense there would be no need for the special enumeration of the particular classes." (*Ibid.; Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 330-331 [158 Cal.Rptr. 370, 599 P.2d 676].) Both of the contingencies specified in former section 20203 represent unexpected losses in the existing assets of the PERS fund. By implication, the phrase "other contingencies" is limited to losses of a similar nature. To construe "other contingencies" in an unrestricted sense would furnish the Legislature or PERS Board with unlimited power to destroy the integrity of PERS funds.

monthly contributions to the retirement fund so that monies regularly appropriated for that purpose can irretrievably be redirected to balance the state budget, the effect is precisely the same, i.e., vested rights of PERS members are impaired.

II

Not every impairment of a contractual right runs afoul of the contract clauses of the state and federal Constitutions. "Although the Contract Clause appears literally to proscribe 'any' impairment . . . 'the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.' [Citations.] Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution." (*United States Trust Co.* v. *New Jersey, supra,* 431 U.S. at p. 21 [52 L.Ed.2d at p. 109].) An attempt must be made to reconcile the strictures of the contract clause with the " 'essential attributes of sovereign power.' " (*Ibid.*) For example, "[m]inimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." (Fn. omitted; *Allied Structural Steel, supra,* 438 U.S. at p. 245 [57 L.Ed.2d at pp. 736-737].)

As we have seen, chapter 115 affects the security of public employees' rights to receive vested benefits. The payment of statutorily defined benefits, upon maturity, is a general obligation of the state regardless of sums existing in the retirement fund (see *England* v. *City of Long Beach* (1945) 27 Cal.2d 343, 348 [163 P.2d 865]; *Bellus* v. *City of Eureka* (1968) 69 Cal.2d 336, 348-352 [71 Cal.Rptr. 135, 444 P.2d 711]; *Crowley* v. *Board of Supervisors* (1948) 88 Cal.App.2d 988, 992 [200 P.2d 107]; cf. *City of Costa Mesa* v. *McKenzie* (1973) 30 Cal.App.3d 763, 773 [106 Cal.Rptr. 569]). It does not necessarily follow, however, that the pensioner possesses the *ability* to compel the payment of benefits as they mature. If the Legislature fails to appropriate sums from the general fund for the purpose of funding the special retirement account or otherwise paying the state's indebtedness to pensioners, a court of this state is powerless to compel the Legislature to appropriate such sums or to order payment of the indebtedness. (Cal. Const., art. XVI, § 7; *California State Employees' Assn.* v. *Cory* (1981) 123 Cal.App.3d 888, 894-897 [176 Cal.Rptr. 904]; *Mandel* v. *Myers* (1981) 29 Cal.3d 531, 539-541 [174 Cal.Rptr. 841, 629 P:2d 935].) We do not question the good faith of the Legislature in enacting chapter 115 and we presume that it harbors no intent inadequately to fund PERS (*California State Employees' Assn.* v. *Cory, supra,* 123 Cal.App.3d at p. 895; *England, supra,* 27 Cal.2d at p. 348; *Bellus, supra,* 69 Cal.2d at p. 351). We nonetheless conclude that the Legislature's rescission of existing appropriations for employer contributions, theoretically representing the "employer's ongoing

share of the actuarial equivalent of amounts necessary to fund current and future benefits due covered employees" (*Carman v. Alvord, supra*, 31 Cal.3d at p. 325), substantially impairs public employees' assurance that they will ultimately receive the retirement benefits to which they become entitled. (See § 20456.) The loss of a $187 million appropriation to the retirement fund, together with the potential long term investment yield therefrom is not inconsequential. More to the point, if it is sound state fiscal policy to balance the budget by diminishing the PERS reserve against deficiencies by $187 million, how much more prudent would be larger and more frequent incursions into the reserve for similar purposes unrelated to the benefit of the members of the trust? (§ 20200; see *Sgaglione v. Levitt, supra*, 337 N.E.2d at p. 595). The question is of course rhetorical.

Reliance of the Director of Finance on *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra*, 22 Cal.3d 208, is misplaced. In *Amador*, the Supreme Court held that an impairment challenge to the validity of article XIII A of the California Constitution was premature. Although passage of article XIII A might result in a substantial reduction in the amount of available revenues to local entities, the court concluded that it did not operate to effect a direct impairment of any contract or bond indebtedness of those entities. (*Id.*, at pp. 239-242.) Unlike *Amador*, we are not dealing here with potential consequences resulting from a legislative reduction in general funds but rather a reduction without regard to actuarial consequences in funds previously allocated by legislative appropriation for special purposes. The impairment is both immediate and substantial.

On the other hand, a substantial impairment may be constitutional if it is "reasonable and necessary to serve an important public purpose." (*United States Trust Co. v. New Jersey, supra*, 431 U.S. at p. 25 [52 L.Ed.2d at p. 112].) In applying this standard, however, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised." (*Id.*, 431 U.S. at p. 26 [52 L.Ed.2d at p. 112]; accord, *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 305-310 [152 Cal.Rptr. 903, 591 P.2d 1].)

Both the California and United States Supreme Courts have identified factors which may warrant legislative impairment of vested contract rights on the grounds of necessity: "(1) the enactment serves to protect basic interests of society, (2) there is an emergency justification for the enactment, (3) the enactment is appropriate for the emergency, and (4) the enactment is designed as a temporary measure, during which time the vested contract rights are not lost but merely deferred for a brief period, interest running during the tem-

porary deferment." (*Olson* v. *Cory* (1980) 27 Cal.3d 532, 539 [178 Cal.Rptr. 568, 636 P.2d 532]; *Sonoma, supra,* 23 Cal.3d at pp. 305-306; *Home Building & Loan Asso.* v. *Blaisdell* (1934) 290 U.S. 398 [78 L.Ed. 413, 54 S.Ct. 231, 88 A.L.R. 1481]; *Allied Structural Steel, supra,* 438 U.S. at p. 242 [57 L.Ed.2d at p. 735].)

It is apparent from the circumstances surrounding the enactment of chapter 115 that the goal of the emergency legislation is to resolve the state's pending fiscal crisis, not to promote or protect the integrity of PERS or benefit its members. Obviously, therefore, the Legislature's suspension of employer contributions neither bears any material relation to the theory of a pension system and its successful operation nor carries out the "beneficent policy" of the pension laws. (*Allen, supra,* 45 Cal.2d at p. 131; *Kern* v. *City of Long Beach, supra,* 29 Cal.2d at pp. 854-855.) And although the Legislature's adoption of cost-cutting measures furthers an important public interest, we find no evidence that the Legislature gave considered thought to the effect the emergency provisions might have on PERS or the possibility of alternative, less drastic, means of accomplishing its goal. (See *United States Trust Co., supra,* 431 U.S. at p. 30 [52 L.Ed.2d at p. 114].) In addition, we find no expression of legislative intent merely to defer the payment of employer contributions for a brief period; to the contrary, the disputed provisions of chapter 115 constitute a repudiation of the state's continuing obligation to make substantial monthly contributions to PERS; accordingly the suspended contributions appear to be irretrievably lost to PERS. Finally, the fact that the spending power of the Legislature is constitutionally limited by California Constitution, article XIII B, does not furnish the necessary justification for unconstitutionally impairing governmental contracts. We therefore conclude the state has failed to meet its burden of demonstrating that the impairment of petitioners' rights is warranted by an "emergency" serving to protect a "basic interest of society." (*Olson* v. *Cory, supra,* 27 Cal.3d at p. 539.)

### III

■ Chapter 115 contains a severability clause.[8] "Such a clause, and the ability to mechanically sever the unconstitutional portions of a statute will ordinarily allow severance, but that process is not compelled unless the remainder of [a] statute '"is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute."'" (*Sonoma County Organization of Public Employees, supra,* 23 Cal.3d at p. 320.)

---

[8]"If any provision of this act or the application thereof to any person or circumstances is temporarily stayed or held invalid, the temporary stay or invalidity shall not affect other provisions or applications of the act which can be given effect without the temporarily stayed or invalid provision or application, and to this end the provisions of this act are severable." (Stats. 1982, ch. 115, § 65.)

The requirements of severance are met here. Sections 58, 59, 60 and 61 and section 14, subdivision (b), deal only with the funding of PERS. They may readily and mechanically be severed from the remaining provisions of chapter 115, which represent categorically distinct cost-cutting measures. Sections 58, 59, 60, and 61 cross reference each other and form one interrelated package; indeed, sections 60 and 61 have no meaning in the absence of section 59. Thus, the constitutional invalidity of sections 58 and 59 renders sections 60 and 61 invalid as well.

IV

■ The Director of Finance asserts that chapter 115 is "amendatory and effectively repeals" previously enacted appropriations by the Legislature. Consequently, any judicial order directing payment in this case would, under the familiar doctrine of separation of governmental powers, trench upon the exclusive constitutional authority of the Legislature to appropriate state monies.

The argument fails. First, the constitutional invalidity of amendatory legislation does not affect the validity of preceding enactments. (*Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 554-555 [171 P.2d 885]; § 9605; see generally 58 Cal.Jur.3d, Statutes, § 54.) An amendment does not effect a repeal of an entire statute, and a repeal by implication is never presumed. (See *County of Kern* v. *Pacific Gas & Electric Co.* (1980) 108 Cal. App.3d 418, 425 [166 Cal.Rptr. 506].) More specifically, an unconstitutional statute may never repeal existing legislation by implication. (58 Cal.Jur.3d, Statutes, § 71.) Further, a statute may not be repealed when vested rights would be impaired. (§ 9606.)

In addition, chapter 115 does not purport to repeal or nullify prior provisions appropriating state-employer contributions to the PERS special fund. (See generally 58 Cal.Jur.3d, State of California, §§ 79, 80.) Instead, the act merely suspends the operation of these sections for three months by providing: "Notwithstanding any other provisions of law . . . funds appropriated from the General Fund for transfer to the Public Employees' Retirement Fund for the months of April through June, inclusive, of 1982 shall revert to the unappropriated surplus of the General Fund." (Stats. 1982, ch. 115, § 58, fn. 1, *ante,* pp. 777-778.) Statutory provisions temporarily suspended are not repealed. (§ 9611; 58 Cal.Jur.3d, Statutes, § 76.)

Hence, earlier legislative appropriation of monies from the general fund to meet employer monthly contributions to PERS remain in full force and effect in the face of the unconstitutional provisions of chapter 115 to the contrary. It is well established that "once funds have already been appropriated by legislative action, a court transgresses no constitutional principle when it orders the State

Controller or other similar official to make appropriate expenditures from such funds." (*Mandel* v. *Meyers, supra,* 29 Cal.3d at p. 540; cf. *California State Employees' Assn.* v. *Cory, supra,* 123 Cal.App.3d at pp. 894-897.)

Let a peremptory writ of mandate issue directing all respondents in these proceedings to perform their legal and ministerial duties without regard to the invalid provisions of sections 58, 59, 60, and 61 and section 14, subdivision (b), of chapter 115 of the Statutes of 1982.

The intervener-real party in interest shall bear the costs of these proceedings.

Regan, J., and Blease, J., concurred.

A petition for a rehearing was denied March 7, 1983, and the petition of real party in interest for a hearing by the Supreme Court was denied April 13, 1983.