349 P.3d 220

**ARIZONA STATE UNIVERSITY ex rel. ARIZONA BOARD OF REGENTS, a body corporate, Plaintiff/Appellant,**

v.

**ARIZONA STATE RETIREMENT SYSTEM, a body corporate, Defendant/Appellee.**

No. 1 CA–CV 14–0083.

Court of Appeals of Arizona, Division 1.

May 5, 2015.

Osborn Maledon P.A. By Thomas L. Hudson, Eric M. Fraser, Phoenix, Co–Counsel for Plaintiff/Appellant.

Office of General Counsel, Arizona State University By Lisa K. Hudson, Tempe, Co–Counsel for Plaintiff/Appellant.

Arizona Attorney General's Office By Jothi Beljan, Phoenix, Counsel for Defendant/Appellee.

Judge PATRICIA K. NORRIS delivered the opinion of the Court, in which Presiding Judge MARGARET H. DOWNIE and Judge RANDALL M. HOWE joined.

## OPINION

NORRIS, Judge:

¶ 1 The dispositive question in this appeal is whether Defendant/Appellee, the Arizona State Retirement System, was required to follow the rulemaking procedure set forth in Arizona's Administrative Procedure Act before enforcing a policy under which it charged Plaintiff/Appellant, Arizona State University, for an actuarial unfunded liability reportedly arising when 17 University employees retired. We hold that it was, and because the System failed to follow the rule-

making procedure, the policy is invalid. Accordingly, we reverse and remand to the superior court for entry of an order directing the System to refund the improper charge, with interest thereon if and as authorized by law.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 The System administers a trust fund which provides retirement and disability benefits in the form of periodic, or lump sum, pension payments to eligible employees of the state and participating political subdivision employers. Ariz.Rev.Stat. ("A.R.S.") §§ 38–711(13), –712, –727, –729, –757, –758, –760, –762 to –764 (2015).[1] The employees, known as "members," may also elect to receive one of several health insurance supplemental benefits. A.R.S. §§ 38–711(23), –783 (2015). Member and employer contributions fund the trust, along with interest on fund assets and investment returns. A.R.S. §§ 38–718, –735 to –737 (2015). To monitor the trust's financial health, the System compares the assets it has accumulated to pay for members' earned benefits with the liabilities it owes for those benefits. See A.R.S. § 38–737(A). When liabilities owed for past service exceed assets accumulated to pay those liabilities, an unfunded actuarial accrued liability exists.

¶ 3 Each year, the System's actuary determines the contribution rates necessary to fund the System's present and future obligations to its members plus payments on any amortized unfunded actuarial accrued liability. A.R.S. §§ 38–736, –737. In determining the contribution rates, the actuary relies on assumptions about members' expected benefit elections, payroll growth, retirement rates, mortality rates, interest rates, and investment returns. The System conducts empirical studies every five years to improve its assumptions. See A.R.S. § 38–714(G) (2015).

¶ 4 The System may incur an actuarial unfunded liability when an employer offers incentives to encourage its employee-members to retire. For example, when an employer increases a member's salary beyond System expectations in exchange for a promise to retire, that member's monthly pension, calculated using the increased salary, see A.R.S. § 38–711(5)(ii)(b), –757 to –759 (2015), may likely exceed the amount the System expected to pay out to that member, thus resulting in an unfunded liability.[2] A termination incentive program may also result in an unfunded liability by causing members to retire and collect benefits sooner and for longer than the System expected.

¶ 5 To address the financial impact of termination incentive programs, see Amended Senate Fact Sheet, H.B.2052, 46 Leg., 2d Reg. Sess. (March 11, 2004), in 2004 the Legislature enacted A.R.S. § 38–749 (2015). 2004 Ariz. Sess. Laws, ch. 106, § 1 (2d Reg. Sess.). Under this statute, "[i]f a termination incentive program that is offered by an employer results in an actuarial unfunded liability" to the System, the employer must pay the System "the amount of the unfunded liability." A.R.S. § 38–749(A). The statute directs the System to "determine the amount of the unfunded liability in consultation with its actuary." Id.[3]

---

**1.** Although the Arizona Legislature amended certain statutes cited in this opinion after the events giving rise to the dispute between the parties, these revisions are immaterial to our resolution of this appeal. Thus, we refer to the current version of these and all other statutes cited in this opinion.

**2.** Like the parties, their witnesses, and A.R.S. § 38–749 (2015), we use the term "actuarial unfunded liability" interchangeably with "unfunded liability."

**3.** A.R.S. § 38–749, in full, provides:

A. If a termination incentive program that is offered by an employer results in an actuarial

unfunded liability to [the System], the employer shall pay to [the System] the amount of the unfunded liability. [The System] shall determine the amount of the unfunded liability in consultation with its actuary.
B. An employer shall notify [the System] if the employer plans to implement a termination incentive program that may affect [System] funding.
C. If [the System] determines that an employer has implemented a termination incentive program that results in an actuarial unfunded liability to [the System], [the System] shall assess the cost of the unfunded liability to that employer. If the employer does not remit full payment of all monies due within ninety days after being notified by [the System] of the

¶ 6 Although A.R.S. § 38–749 refers to an "actuarial unfunded liability," the statute does not explain how to determine when a termination incentive program results in an actuarial unfunded liability or how to calculate "the amount of the unfunded liability." To answer these questions, the System's executive staff discussed the statute with the System's actuary. They considered two methods of calculating the unfunded liability, one which would discount the charge to employers by the amount of additional benefits a member would have received if he or she had continued working instead of retiring and one which would not provide employers with this discount. As a result of these discussions, the System's executive staff adopted the first method and directed the System's actuary to draft the System's "Policy on Employer Early Termination Incentive Programs" to memorialize how the System would implement A.R.S. § 38–749.

¶ 7 The Policy requires employers to notify the System of all members who participate in a termination incentive program and to disclose their demographic and salary information, as well as their benefits elections. Using this information, the System's actuary calculates the present value, under System actuarial assumptions, of the member's future benefits as if he or she had not retired ("active liability") and the present value, under System actuarial assumptions, of the member's future benefits taking into account his or her actual retirement date and actual benefit elections ("retired liability").

¶ 8 Under the Policy, when retired liability exceeds active liability, an unfunded liability results from the member's participation in the termination incentive program, and the

employer is liable for the difference. When, however, a member's active liability exceeds his or her retired liability, the employer will receive credit. If credits exceed liabilities, the employer does not receive reimbursement; there is merely no charge. The System has applied the Policy consistently to all System employers.

¶ 9 In 2011, the University offered one year's salary as an incentive payment to eligible employees if they agreed to retire that year. Seventeen System members accepted the University's offer.[4] Applying the Policy, the System determined the University's termination incentive program resulted in an unfunded liability of $1,149,103, which it then charged to the University. The University paid the charge, but appealed it, arguing the System had, first, adopted a rule without following the rulemaking procedure provided by Arizona's Administrative Procedure Act ("APA"), codified at A.R.S. §§ 41–1001 to – 1092 (2013 & Supp.2014); and, second, charged the University for retirements that did not result in an actuarial unfunded liability.

¶ 10 At a hearing before the Office of Administrative Hearings, the University's actuarial expert and the System's actuary agreed that "actuarial standards of practice are not detailed enough to give us specific direction about how to interpret a term like unfunded liability." The University's expert offered an alternative method of calculating actuarial unfunded liability, consistent, in her opinion, with generally accepted actuarial standards, the System's actuarial assumptions, and A.R.S. § 38–749. Based on that method, she testified the University's termi-

---

amount due, the unpaid amount accrues interest until the amount is paid in full. The interest rate is the interest rate assumption that is approved by the board for actuarial equivalency for the period in question to the date payment is received.

D. For the purposes of this section, "termination incentive program":

1. Means a total increase in compensation of thirty per cent or more that is given to a member in any one or more years before termination that are used to calculate the member's average monthly compensation if that increase in compensation is used to calculate the member's retirement benefit and that in-

crease in compensation is not attributed to a promotion.

2. Means anything of value, including any monies, credited service or points that the employer provides to or on behalf of a member that is conditioned on the member's termination except for payments to an employee for accrued vacation, sick leave or compensatory time unless the payment is enhanced beyond the employer's customary payment.

4. This incentive payment was not compensation for the purpose of calculating the members' retirement benefits. *See generally* A.R.S. § 38–711(5)(ii)(b), –757 to –759.

nation incentive program did not result in any unfunded liability because it did not cause more members to retire than the System had projected based on its assumptions.

¶ 11 The University's expert also testified the System should not charge employers for unfunded liability resulting from members' benefits elections because whether a member elects the benefit option predicted by the System's assumptions or a more expensive option has nothing to do with that member's participation in a termination incentive program. She pointed out the System charged the University for one member's health benefit election, even though, under System assumptions, the member had a 100% chance of retiring that year; and, thus, his retirement was not the result of a termination incentive program.

¶ 12 The System's actuary and the System's Assistant Director of External Affairs also acknowledged that A.R.S. § 38–749 does not explain how to determine whether a termination incentive program results in an actuarial unfunded liability or how to calculate that unfunded liability. The System's actuary testified that the other method of calculating unfunded liability he had discussed with executive staff before they adopted the Policy, see *supra* ¶ 6, is consistent with A.R.S. § 38–749, the System's actuarial assumptions, and generally accepted actuarial standards. He explained the System had, however, "interpreted" the term "unfunded liability" in the manner reflected in the Policy because it was "less onerous for employers."

¶ 13 The administrative law judge ruled in favor of the System, finding the University had failed to show the System's "methodology for calculating unfunded liability resulting from a[ ] . . . termination incentive program . . . [was] unreasonable, or an abuse of discretion, or contrary to law." The administrative law judge also found that because A.R.S. § 38–749 did not require the System to adopt a rule before implementing the Policy, it was not required to do so. The System's board

accepted the administrative law judge's findings of fact and conclusions of law with immaterial alterations, and the University filed an action for judicial review in the superior court. *See* A.R.S. § 12–905 (2003). The superior court upheld the board's determination, and this appeal followed.

## DISCUSSION

### I. The Policy is a Rule

▪ ¶ 14 On appeal, the University argues the Policy is a rule within the meaning of the APA and, therefore, because the System adopted it without following the rulemaking procedure provided in the APA, it is void. Reviewing this issue de novo, but granting deference to the System's interpretation of statutes and its own regulations, *see Carondelet Health Servs., Inc. v. Ariz. Health Care Cost Containment Sys. Admin.*, 182 Ariz. 221, 226, 895 P.2d 133, 138 (App.1994), we agree with the University.[5]

¶ 15 The APA defines "rule" as:

an agency statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of an agency. Rule includes prescribing fees or the amendment or repeal of a prior rule but does not include intraagency memoranda that are not delegation agreements.

A.R.S. § 41–1001(19) (Supp.2014).

▪ ¶ 16 Thus, barring any exemptions, an agency statement is a rule, subject to the APA's rulemaking procedure, if it, first, is generally applicable, and, second, implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of an agency. At the administrative hearing, the System acknowledged it had applied the Policy consistently to all System employers since its adoption, and, thus, the Policy satisfies the general applicability requirement. *See Carondelet*, 182 Ariz. at 227, 895 P.2d at 139 (agency admission that "its methodology is generally applied to all hospitals" satisfies general applicability element).

---

**5.** The University also argues the System's method of determining whether a termination incentive program "results" in actuarial unfunded liability and calculating the amount of that liability is contrary to law and arbitrary and capricious. Given our resolution of the rulemaking issue, we do not need to address this argument.

¶ 17 The Policy also satisfies the second requirement. As discussed, the System adopted the Policy to implement A.R.S. § 38–749. The ordinary meaning of the word "implement" is "[t]o put into practical effect; carry out." American Heritage Dictionary 880 (4th ed.2006); *see Stout v. Taylor*, 233 Ariz. 275, 278, ¶ 12, 311 P.3d 1088, 1091 (App.2013) (court may refer to established and widely used dictionaries to determine ordinary meaning of word). By charging employers under the Policy for an unfunded liability which results from termination incentive programs, the System has put A.R.S. § 38–749 into practical effect. *See* A.R.S. § 41–1001(19); *Carondelet*, 182 Ariz. at 227, 895 P.2d at 139 (agency methodology was a rule because, among other reasons, it implemented a session law).

¶ 18 Further, the Policy interprets A.R.S. § 38–749. The plain language of the statute leaves open questions such as: how to determine if a termination incentive program "results in an actuarial unfunded liability"; how to calculate the amount of an unfunded liability; and whether to charge employers if members elect more expensive benefit options than the System assumed, even though these elections may not, strictly speaking, be the result of a termination incentive program. *Cf. Sw. Ambulance, Inc. v. Ariz. Dep't of Health Servs.*, 183 Ariz. 258, 261, 902 P.2d 1362, 1365 (App.1995), *superseded by statute*, 1998 Ariz. Sess. Laws, ch. 57, § 39 (2d Reg.Sess.) (ambulance services rate schedules were rules because they specified "how a fraction of an hour is to be charged, how mileage is to be charged, the assessment of charges for the transport of multiple patients, what constitutes a minimum charge, [and] when the rate for advanced life support may be charged").

¶ 19 Like the hospital reimbursement methodology at issue in *Carondelet*, the Policy involves a "complex calculation with subjective components whose inclusion, or even definition, have a significant effect" on the amount the System charges employers. *See* 182 Ariz. at 227, 895 P.2d at 139. And, like the session law at issue in *Carondelet*, the governing statute here, A.R.S. § 38–749, "does not set forth the calculations to be

made and leaves much" to the System's discretion. *See id.* at 227–28, 895 P.2d at 139–40. *Carondelet* involved a session law which directed the Arizona Health Care Cost Containment System ("AHCCCS") to adjust its hospital reimbursement multipliers based on new six-month charges and volume reports. *Id.* at 224, 895 P.2d at 136. We held the methodology AHCCCS adopted to implement the session law was a rule because, among other reasons, the session law did "not set forth the calculations to be made" and did not direct "how the amount of reimbursement [was to] be determined." *Id.* at 228, 895 P.2d at 140. Similarly, A.R.S. § 38–749 directs the System to make a calculation, but it does not specify how the calculation is to be made. In other words, to implement A.R.S. § 38–749, one must first interpret it.

¶ 20 Despite the foregoing, the System contends the Policy does not implement or interpret A.R.S. § 38–749, arguing the statute is self-executing and leaves no room for agency discretion. According to the System, unlike the challenged policies in *Carondelet* and *Southwest Ambulance*, the Policy here does not involve "subjective" judgments and merely applies "the same actuarial assumptions used to operate the entire defined-benefit plan and the same calculation used to calculate the plan's liability."

¶ 21 The evidence presented at the administrative hearing squarely contradicts this position. As discussed, the System's actuary and Assistant Director of External Affairs both conceded A.R.S. § 38–749 does not explain how the amount of an unfunded liability should be calculated. Both the University's actuarial expert and the System's actuary offered alternative methods of calculating the amount of an unfunded liability that they testified were consistent with A.R.S. § 38–749, the System's actuarial assumptions, and generally applicable actuarial standards of practice. In fact, the System's actuary testified the System considered two methods of making the calculation, and it selected the calculation that appears in the Policy not because it was more consistent with A.R.S. § 38–749 or the System's actuarial assumptions, but because it was "less onerous for employers." Thus, to carry out its mandate

under A.R.S. § 38–749, the System was required to exercise judgment and discretion in crafting the Policy, and it, in fact, did so. *See Carondelet,* 182 Ariz. at 228–29, 895 P.2d at 140–41 (session law not self-executing because it left matters to agency's discretion and did not direct any one particular course of action).

¶ 22 Accordingly, the Policy was a rule within the meaning of the APA.

## II. In the Absence of an Exemption, an Agency Must Comply with the APA

¶ 23 The System argues that even if the Policy is a rule, it was not required to comply with the APA because the Legislature did not expressly require rulemaking in A.R.S. § 38–749. Although we agree A.R.S. § 38–749 says nothing about rulemaking, the statute's silence does not exempt the System from the APA's rulemaking procedure.

¶ 24 The rulemaking procedure of the APA "appl[ies] to all agencies and all proceedings not expressly exempted." A.R.S. § 41–1002(A) (2013); *see Carondelet,* 182 Ariz. at 228, 895 P.2d at 140 (rejecting argument that from legislative silence one can infer "the legislature never envisioned the need for an explanatory rule"). Neither A.R.S. § 38–749 nor the APA, *see* A.R.S. § 41–1005 (Supp.2014), exempt the System from rulemaking; therefore, rulemaking is required before the Policy can be given effect. *See* A.R.S. § 41–1030(A) (2013).

¶ 25 The System contends *Carondelet* does not support the proposition that rulemaking is required when the Legislature is silent on the question. The System attempts to distinguish *Carondelet* by arguing that the policy at issue in that case implemented a session law which incorporated by reference a prior statute which expressly called for rulemaking. 182 Ariz. at 228, 895 P.2d at 140. The *Carondelet* court, however, merely used this fact to "bolster[ ]" its conclusion after it had resolved the issue under A.R.S. § 41–1002(A). *Id.*

¶ 26 Invoking the principle of *expressio unius est exclusio alterius*—a canon of statutory construction that when statutes set forth a requirement in one provision but not in another, a court should assume the absence of the provision was intentional—the System

further argues the Legislature intended to exempt it from rulemaking because it expressly required the System to engage in rulemaking in other statutes, A.R.S. §§ 38–735, 755, 764 (2015). *See generally Ezell v. Quon,* 224 Ariz. 532, 541, ¶ 41, 233 P.3d 645, 654 (App.2010) (discussing this canon of construction).

¶ 27 When the Legislature's intent is clear, however, interpretative canons of construction are inapplicable. Section 41–1002 provides that in the absence of an express exemption, agencies must comply with the APA, and we cannot ignore this unambiguous language in favor of a secondary principle of statutory interpretation. *See Forsythe v. Paschal,* 34 Ariz. 380, 383, 271 P. 865, 866 (1928) (*expressio unius* should not be applied to contradict "general context" of statute and "public policy of the state"); *Microchip Tech. Inc. v. State,* 230 Ariz. 303, 306–07, ¶ 12, 283 P.3d 34, 37–38 (App.2012) (because text of statute was clear, resort to principle of *expressio unius* was unnecessary (citing *Sw. Iron & Steel Indus., Inc. v. State,* 123 Ariz. 78, 79–80, 597 P.2d 981, 982–83 (1979) ("The doctrine of 'expressio unius' is not to be applied where its application contradicts the general meaning of the statute or state public policy."))).

## III. Compliance with the APA Would Not Require the System to Breach its Fiduciary Duties

¶ 28 The System also argues that allowing "employer input on unfunded liability calculations" through rulemaking procedure, *see* A.R.S. § 41–1023 (2013), would require it to breach its fiduciary duty to the trust and its beneficiaries under the Arizona Constitution. *See* Ariz. Const. art. XXIX, § 1(A) ("Public retirement systems shall be funded with contributions and investment earnings using actuarial methods and assumptions that are consistent with generally accepted actuarial standards."). In support of this argument, the System cites two California cases, which, for purposes of this appeal, do little more than establish that a state retirement system's fiduciary and contractual duties to its beneficiaries sometimes trump legislative and municipal priorities. *City of Sacramento v. Pub. Emps. Ret. Sys.,* 229 Cal.App.3d 1470, 280 Cal.Rptr. 847, 860–61

(1991) (retirement system's interpretation of federal labor statutes which tended to increase city's contributions to system did not violate California constitutional provision that system minimize employer contributions because, in part, to do so would require system to favor employers over beneficiaries to whom it owes a fiduciary duty); *Valdes v. Cory,* 139 Cal.App.3d 773, 189 Cal.Rptr. 212, 221–24 (1983) (legislation suspending employer contributions to state retirement system violated beneficiaries' vested contractual rights to retirement benefits). Here, however, we are not faced with a situation in which a legislative enactment conflicts with the System's fiduciary duties to the trust and its beneficiaries; the question is simply whether the System must comply with the APA's rulemaking procedure—a question which is neutral to the interests of the trust and its beneficiaries.

¶ 29 Moreover, merely following rulemaking procedure would not cause the System to breach its fiduciary duties. *Cf. Carondelet,* 182 Ariz. at 229, 895 P.2d at 141 (rejecting argument that forcing agency to comply with APA would "tie [its] hands" and not allow it to fulfill its statutory mandate). The APA requires an agency to provide meaningful opportunity for public comment on and discussion of proposed rules. A.R.S. § 41–1023(B), (C). The APA does not, however, require an agency to blindly heed any and every suggestion it receives. Rather, the APA merely requires an agency to "consider" public comments before making a rule, A.R.S. § 41–1024(C) (2013), and the agency remains free to "use its own experience, technical competence, specialized knowledge and judgment in the making of a rule." *Id.* at (D).

## IV. The System is an Agency Subject to the APA

█ ¶ 30 The System next argues it is exempt from the APA because it is not a "regulatory state agenc[y]"—in the sense of

regulating the general public or any particular industry—and instead it is a state agency that serves a fiduciary function.[6] As defined by the APA, however, " '[a]gency' means any board, commission, department, officer or other administrative unit of this state...." A.R.S. § 41–1001(1). The APA's definition of "agency" makes no exception for agencies that perform fiduciary as opposed to more traditional regulatory functions. Indeed, consistent with the System's status as an agency subject to the APA, the Legislature specifically granted the System authority to "[a]dopt, amend or repeal rules for the administration of the plan" and "this article"—a reference to the statutory article that includes A.R.S. § 38–749. A.R.S. § 38–714(E)(4) (2015).

¶ 31 The System further argues that forcing it to comply with the APA under the circumstances here would be "absurd" because the APA was not intended to protect the rights of "one division of state government," the University, from the actions of another, the System. The foregoing definition of "agency," however, makes no exception for agencies whose decisions affect the rights of divisions and political subdivisions of the state. *See* A.R.S. § 41–1001(1). Accordingly, we have held that rules promulgated without following the rulemaking procedure of the APA are unenforceable against political subdivisions of the state. *See, e.g., Cochise Cnty. v. Ariz. Health Care Cost Containment Sys.,* 170 Ariz. 443, 445, 825 P.2d 968, 970 (App.1991). Furthermore, the System's decision to adopt the Policy affects all System members and all System employers—which, as a factual matter, may include state political subdivisions and their subordinate "entities" in addition to divisions of the state. A.R.S. § 38–711(13).

## V. The System's Failure to Comply with the APA Renders the Policy Invalid

█ ¶ 32 "A rule is invalid unless it is made and approved in substantial compliance

6. Relying on *Canyon Ambulatory Surgery Ctr. v. SCF Ariz.,* the System argues the APA "governs only those agencies that perform governmental functions," 225 Ariz. 414, 419, ¶ 19, 239 P.3d 733, 738 (App.2010), and, thus, the APA does not apply to the System insofar as it serves a fiduciary function. The statement from *Canyon Ambulatory* the System quotes, however, was a recita-

tion of the ground on which the superior court resolved that case. *Id.* This court declined to affirm on the issue of whether the State Compensation Fund "is a state agency subject to the APA" and instead decided the case on the basis that the policy at issue there was not a rule. *Id.* at 419–20, ¶¶ 19, 21, 239 P.3d at 738–39.

with [the APA], unless otherwise provided by law." A.R.S. § 41–1030(A); *accord Sw. Ambulance*, 183 Ariz. at 262, 902 P.2d at 1366; *Cochise Cnty.*, 170 Ariz. at 445, 825 P.2d at 970. As discussed, the Policy is a rule, and the System adopted it without "substantial compliance" with the rulemaking procedure of the APA. Accordingly, the Policy is invalid, and the System was not entitled to charge the University for the 17 retirements. *See, e.g., Carondelet*, 182 Ariz. at 229–30, 895 P.2d at 141–42 (agency ordered to compensate hospitals that received reduced reimbursement under policy adopted outside of APA).

## CONCLUSION

¶ 33 For the foregoing reasons, we reverse the superior court's decision affirming the ruling of the System's board and remand to the superior court to enter an order directing the System to refund $1,149,103 to the University, with interest thereon if and as authorized by law—an issue the superior court should address on remand. Contingent upon its compliance with Arizona Rule of Civil Appellate Procedure 21, we award the University its taxable costs on appeal pursuant to A.R.S. § 12–341 (2003).